FOURTH NAT. BANK OF NASHVILLE *v.* E. B. STAHLMAN
*et ux.**

SAME *v.* NASHVILLE BANNER PUBLISHING COMPANY, *et al.*

(*Jackson.*   April Term, 1915.)

1. **BANKS AND BANKING.**   National banks.   Stock purchasing
contract.

A contract between a national bank and the promoter of a build-
ing corporation, whereby the promoter was to purchase from the
bank stock subscribed for by it, was not *ultra vires* of the bank,
the stock having been taken by the bank as part of a transaction
for the renting of banking quarters.   (*Post, p.* 379.)

2. **BANKS AND BANKING.**   National banks.   Powers.   Pur-
chase of stock.

Under Rev. St. U. S., sec. 5137 (U. S. Comp. St. 1913, sec. 9674),
providing that a national bank may purchase and hold real
estate necessary for its immediate accommodation in the transac-
tion of its business, and section 5136 (section 9661), providing
that such bank may exercise all incidental powers necessary to
carry on the business, a national bank may acquire and hold
stock in a building corporation as part of a transaction for
renting desirable banking quarters; good faith being the test
whether such investment is legitimate.   (*Post, p.* 380.)

Cases cited and approved:   California Bank v. Kennedy, 167 U.
S., 362; Mapes v. Scott, 94 Ill., 379; Talbot v. First Nat. Bank,
185 U. S., 172; Portland Nat. Bank v. Scott, 20 Or., 421; Wingert

*This cause was heard at the last term of the Supreme Court
at Nashville, 1914, and was taken under advisement by the Court and
decree rendered at Jackson, Tenn., during the April term, 1915, to
be entered at Nashville under the provisions of the Act of 1915,
same being filed with the clerk of the court at Nashville, Tenn., on
July 6, 1915.   Chief Justice Neil incompetent on account of re-
lationship.—Editor.

v. First Nat. Bank, 175 Fed., 739; Id., 223 U. S., 670; Weeks v. Int. Trust Co., 60 C. C. A., 236; Farmers' Dep. Nat. Bank v. West Pa. Fuel Co., 215 Pa., 115; Union Nat. Bank v. Matthews, 98 U. S., 621; Marble Co. v. Harvey, 92 Tenn., 115; First Nat. Bank of Concord v. Hawkins, 174 U. S., 564; First Nat. Bank v. Converse, 200 U. S., 425; Merchants' Nat. Bank v. Wehrmann, 202 U. S., 295.

3. **BANKS AND BANKING.** National banks. Power to purchase stock.

While it is unlawful for a national bank to deal in stocks, it may loan money on shares of other corporations, and in order to collect the debt may purchase the stock, or may acquire it to protect itself against loss in compromising a doubtful liability. (*Post, p.* 384.)

Cases cited and approved: First Nat. Bank v. Exchange Nat. Bank, 92 U. S., 122; California Bank v. Kennedy, 167 U. S., 362; Germania Nat. Bank v. Receiver, 99 U. S., 629; National Bank v. Matthews, 98 U. S., 621.

4. **CONTRACTS.** Consideration. Mutual promises.

A contract between a national bank and the promoter of a building corporation, whereby the promoter agreed to purchase from the bank building corporation stock held by it, in consideration that the bank would pay its subscription for the stock, was not void as being unilateral; the obligation to sell and buy being mutual. (*Post, p.* 388.)

5. **CORPORATIONS.** Stock. Contract for purchase.

An agreement between a bank and the promoter of a building corporation, whereby the latter agreed to purchase certain shares of stock owned by the bank, the bank reserving an option to sell the stock at any time to other persons, but providing that the promoter was to have the option to buy such stock at par and accumulated dividends at any time before the bank sold it to others, and providing for thirty days' notice to the promoter before selling, is an absolute and unconditional agreement to sell, and not a mere option. (*Post, p.* 388.)

Fourth Nat. Bank v. Stahlman.

6. **CORPORATIONS.  Transfer of stock.  Unpaid dividends.**

A contract between a bank and the promoter of a building corporation, whereby the promoter agreed to buy certain guaranteed six per cent. cumulative preferred stock in the building corporation from the bank, and that if any dividends upon such stock remained unpaid at the time of purchase the promoter was to pay the accumulated dividends at the rate of six per cent. per annum, bears interest as upon a loan, and the promoter is liable for guaranteed dividends unpaid by the corporation, although not earned nor declared by it.  (*Post, p.* 390.)

7. **ACCOUNT STATED.  Omission of item.**

Where a bank rendered a statement containing separate items of indebtedness in response to a debtor's request, and the latter thereupon made a tender of the amount stated, that the bank had erroneously omitted a particular item from the statement did not estop it from suing thereon; no one having been prejudiced by the making of such statement.  (*Post, p.* 392.)

8. **PLEDGES.  Release of securities.  Tender.**

Where a creditor holds securities as collateral for several items of indebtedness, a tender by the debtor which does not include all such items does not operate to release the securities.  (*Post, p.* 393.)

9. **BILLS AND NOTES.  Release of attorney's fees.  Effect of tender.**

A tender by a debtor of full payment of a note, constituting one of several items of indebtedness, was sufficient to exonerate him from the payment of attorney's fees stipulated therein; the note not being disputed.  (*Post, p.* 393.)

10. **PLEDGES.  Security for loans.  Debts secured.  "Obligation."**

Collateral deposited with a bank to secure a promissory note, written on the blank form furnished by the bank and reciting that such collateral "shall be applicable in like manner to secure the payment of any other obligations of the undersigned, whether past or future, held by the holder of this obligation.
132Tenn.24

All such securities in their hands shall stand as one general
continuing security for the whole of such obligations, so that
the deficiency on any one shall be made good from the collateral
upon the rest"—may be held by the bank to secure the per-
formance of a contract previously executed, whereby the pledgor
agreed to purchase certain corporate stock from the bank, such
contract constituting an "obligation" within the recitals of the
note.   (*Post, p.* 395.)

Case cited and approved:   Bank v. Wood, 125 Tenn., 16.

Cases cited and distinguished:   Gillet v. Bank of America, 160
N. Y., 555; Cocke v. Hoffman, 73 Tenn., 112; Loyd v. Lynchburg
Bank, 86 Va., 690; First Nat. Bank of Omaha v. Illinois Trust
& Savings Bank (C. C.), 84 Fed., 34; Brown v. James, 80 Neb.,
475; Torrance v. Third Nat. Bank of Pittsburg, 210 Fed., 806;
Harris v. Bank of Franklin, 77 Md., 423; Hallowell v. Blackstone
Nat. Bank, 154 Mass., 359; Norfleet v. Insurance Co., 160 N. C.,
329; Milling Co. v. Steverson, 161 N. C., 512; Bank v. Lumber
Co. (C. C.), 194 Fed., 732; Wilson v. Carothers (Ky.), 43 S. W.,
684; Hanover Nat. Bank v. Brown, 53 S. W., 206; Gillet v. Bank
of America, 160 N. Y., 555.

11. **PLEDGES.   Security for loans.   Application of collateral.**

Where the language of a note made to a bank by its customer,
under which collateral is deposited as security, is unambiguous,
and plainly shows that the parties contemplated that such col-
lateral might be held as security for all other legal obligations
or liabilities, the contract will be so construed, it being only
where the language is ambiguous and the meaning doubtful that
its provisions will be limited to a restricted class of obligations
presumed to have been in the contemplation of the parties when
the contract was made.   (*Post, p.* 410.)

12. **PLEDGES.   Security for loans.   Application of collateral.**

Where collateral has been deposited with a bank to secure a
promissory note, reciting that the collateral shall be applicable
in like manner to secure the payment of any other obligations
of the undersigned, whether past or future, held by the holder
of such obligation, such language will not be construed to mean

Fourth Nat. Bank v. Stahlman.

that another bank, to which the holder might transfer the note with its collaterals, can hold them as security for other debts which the maker might have created with such other bank, since such other debts would not have been in the contemplation of the parties when the loan was made. (*Post, p.* 411.)

13. PLEDGES. *Application of collateral to other debts. Surety's right of subrogation.*

Where collateral has been deposited with a bank to secure a promissory note, reciting that such collateral may be applied to all other obligations of the maker to the bank, a surety or indorser who pays such note will be subrogated to the place of the bank as to such collaterals, which right may not be defeated by the application of the collaterals to any other debts owing by the maker to the bank. (*Post, p.* 412.)

Cases cited and approved: Bank v. Wood, 125 Tenn., 16; Hallowell v. Blackstone Nat. Bank, 154 Mass., 359; Wilson v. Carothers (Ky.), 43 S. W., 684; First Nat. Bank of Omaha v. Illinois Trust & Savings Bank (C. C.), 84 Fed., 34; Gillet *v.* Bank of America, 160 N. Y., 549; Titcomb v. McAllister, 81 Me., 399.

Cases cited and distinguished: Richardson v. Washington Bank, 3 Metc. (Mass.), 536; Fall River Nat. Bank v. Slade, 153 Mass., 415.

FROM DAVIDSON.

Appeal from the Chancery Court of Davidson County.—JNO. ALLISON, Chancellor.

P. D. MADDIN and JOHN J. VERTREES, for Fourth Nat. Bank.

E. A. PRICE, H. H. BARR, and PITTS & McCONNICO, for Stahlman and Banner Pub. Co.

Mr. Justice Fancher delivered the opinion of the Court.

These two suits were tried together upon the same facts and involving the following questions:

The Fourth National Bank of Nashville, Tennessee, was a highly prosperous and growing concern. It owned its own banking house, situated upon Third avenue north in the city of Nashville, and a short distance south of Union street, but this house was not adequate to the increasing demands made upon it for banking facilities. This location was in the center of the financial district of the city, and was considered a very desirable location, but there was another lot on the corner of Third avenue and Union street, owned by the defendant E. B. Stahlman, which was considered a better location for a banking business than that owned by the bank. This corner lot was an old banking site which had been used for such purposes since before the Civil War. The Fourth National Bank at first had in view the construction of a banking building upon its own lot, and appointed a committee as early as 1902 to consider the question of remodeling the old building, or the construction of a new building in order to secure a larger banking room and more commodious quarters. This committee visited a number of cities in the North and East and examined up-to-date banking buildings. The bank considered the question of purchasing adjacent lots of land in order to give it additional room for a larger building. These matters were

considered by the committee and the officers of the bank, and postponed from time to time until in the year 1905.

In that year, Maj. E. B. Stahlman approached the bank on the subject of acquiring the adjacent real estate belonging to the Fourth National Bank and other adjacent lands to his corner lot on Union street and Third avenue, and suggested tearing down the old buildings and erecting a modern twelve-story office building on the corner, with large and elegant banking room immediately on the corner on the first floor of the building, with vaults and other necessary rooms to be occupied by the bank under a long lease. He offered to promote a corporation for this purpose, and suggested that the bank convey its lands to the corporation at the price of $58,000 to be paid for in the preferred stock of the building corporation, and that the bank would also loan $45,000 for the purpose of assisting in the construction of the building upon long-time notes. He desired this $45,000 to be secured by the stock in the corporation. The bank refused to make the loan upon the terms desired, because it was not according to its custom of business. Major Stahlman next proposed that the bank subscribe for this $45,000 of stock, and he would buy the stock back from it at stated intervals, and in order to guarantee that he would carry out the contract, he would give security other than the stock itself.

The building contemplated a total investment of about $875,000, and it was suggested that the preferred

stock should amount to $400,000, and that common stock would be issued to an amount to be agreed upon later. On April 12, 1905, these suggestions were embodied in a contract signed and executed by Major Stahlman, as promoter, and the bank, and the agreement was that the stock to be taken by the bank should be preferred, and providing a guaranteed cumulative dividend of six per cent. per annum, the dividends to begin when the deed was made for the real estate, as to the stock for the purchase of the lots, and to begin when the money should be paid by the bank, as to the $45,000 of subscription stock. It was provided that the bank should have certain desirable quarters on the first floor and in the basement at a rental of $12,000 per annum, for a period of ten years and renewable at that price for another ten years. For other periods extending the whole time of the right to lease to fifty years, the bank should have the option and the terms to be agreed upon or fixed by arbitration.

The promoter agreed that he would bring out a corporation for these purposes, and that it would expend not less than $40,000, nor more than $45,000 for vaults, railings, counters, desks, marble fixtures, decorations of ceiling and walls, etc., according to plans to be selected by the bank. The banking room was not to be less than 4,500 square feet in the clear, and also in connection with the banking room there would be constructed and furnished 3,000 square feet in the basement, to be arranged, subdivided, and equipped to the best needs and convenience of the bank.

It was further stipulated that the bank should have the right to transfer and assign its lease and renewals thereof, but that the said building corporation to be brought out should not rent any space in the building to any other bank, person, firm or corporation doing a banking business, and giving the Fourth National Bank exclusive banking quarters. A time limit within which these things should be done was agreed upon. This time limit was further extended on July 20, 1905, and further stipulations concerning the contract were then entered into. On April 5, 1906, the final agreement was concluded, reciting these former agreements, making it the final contract between the parties.

Mollie T. Stahlman, the wife of E. B. Stahlman, joined in this final contract, and it was provided that, in consideration of the payment of the subscription of the Fourth National Bank of said $45,000 of capital stock, that the said Stahlman and wife would buy from the bank, and the bank agreed to sell to the said Stahlman and wife the said $45,000 of capital stock at par or face value thereof, to be taken and paid for at intervals from December 1, 1909, to December 1, 1912, and provided, further, that if any dividends upon said stock remained unpaid at the time of said purchases, Stahlman and wife were to pay the accumulated dividends, which were to be at the rate of six per cent per annum, or one-half per cent. per month. Said E. B. Stahlman and wife were to have the right at any time to take up and pay for the stock at the price stipulated, and they deposited with the bank insurance policies on the

life of E. B. Stahlman, legally assigned to the bank, to an amount equal to $45,000.

This building corporation had, in the meantime, been organized as the Mecklenburg Real Estate Company, a conveyance had been executed by the bank prior to this final agreement, conveying the real estate to the Mecklenburg Company, and the building was then in process of erection.

The bank reserved the option to sell and dispose of the $45,000 of stock subscribed for by it at any time to any persons, but it was agreed that Stahlman and wife, or either of them, should have the option to buy said stock at par and accumulated dividends at any time or times before the bank sold it to others, and in order that this might be done, at least thirty days notice of the desire of the bank to sell the stock or any part thereof shall be given Stahlman and wife before the bank shall have the right to sell to others.

Is the contract of Stahlman and wife of April 5, 1906, under the circumstances of this case, to buy from the bank this $45,000 of stock for which the bank had subscribed, enforceable? This is the leading issue in the litigation. It is insisted by the defendants that a national bank cannot take stock in another corporation because it is against public policy, *ultra vires* the powers of the bank, and the contract, still being executory, cannot be enforced; also that the contract for the purchase of the stock by Stahlman is unenforceable for want of a valuable consideration; that the so-called agreement to purchase was a mere option, with

no corresponding obligation on the part of the bank to sell to Stahlman; and if enforceable at all, accumulated unpaid dividends, or interest, cannot be recovered as upon a loan, as the bank contends; that upon any construction of the rights and obligations of the parties, the provisions in the contract for security are exclusive, and that collaterals held by the bank on other loans cannot be retained to cover this liability.

Major Stahlman owed the bank a number of loans made to him and the Banner Publishing Company, and others for whom he was security, and on one of these notes of $24,400, the bank held as collateral security a block of one hundred shares of stock in the Banner Publishing Company said to be very valuable. These various notes held by the bank contained general printed stipulations that the pledged securities—
"shall be applicable in like manner to secure the payment of any other obligations of the undersigned, whether past or future, held by the holder of this obligation. All such securities in their hands shall stand as one general continuing security for the whole of such obligations so that the deficiency on any one shall be made good from the collateral from the rest."

The position of the defendant is that this collateral security agreement will not be construed as applying to secure contracts or obligations different in nature from those for which they were placed, but only those of like kind; that is, on promissory notes or purely banking obligations.

The suits originally involved a number of questions, many of which are now eliminated.  A short time before the suits were brought the bank made a call on Major Stahlman to pay, by a given day, all his obligations, including large bank loans, and the stock purchase debt with dividends thereon, which had not been paid by the Mecklenburg Company.

Major Stahlman thereupon demanded an itemized statement of all these debts, which was furnished by the bank, and he then, on the date demanded by the bank, tendered to the bank the full amount claimed, except the amount claimed under the $45,000 stock purchase agreement, and demanded the surrender to him of all collaterals held on the note for $24,400, which tender the bank refused, on the ground that it did not include the amount under the stock purchase agreement.

After the suits, however, Major Stahlman did pay, either to the bank direct or into court, all these bank debts, leaving only an item of interest which had been omitted in the statement by the bank and the stock purchase debt unpaid.

The chancellor held that Major Stahlman was liable on his contract to purchase the stock and for dividends thereon, and that the complainant was entitled to hold all collaterals, decreed a sale of them to pay the judgment, and for the costs of the case.  He released Mrs. Stahlman on a plea of coverture, and held that the bank was not entitled to recover attorney's fees on a note of $24,400, as provided on its face, on the ground

that Major Stahlman tendered payment in full on this note. Judgment was had on all these loans due the bank, to be credited by the money in court under the tenders.

Defendant Stahlman appealed to this court.

We will now consider the stock purchase agreement of April 5, 1906.

It is urged by defendant that the bank actively aided in the promotion of the Mecklenburg Company, dictated its affairs, had placed on its board of directors and among its officials numbers of the bank officials and patrons; that its cashier's letter was attached to the prospectus, and it otherwise actively secured subscriptions to stock; that its own stockholders to a large number became stockholders in the building concern; that it dictated a limit on the issue of common stock; required Stahlman to give his proxy to the bank to vote $100,000 of the common stock for a period of five years, and that this was not a good-faith transaction by the bank; that it had ample real estate upon which to build a structure of its own, and various circumstances are urged why it was not necessary to take stock in the Mecklenburg Real Estate Company.

The bank had a capital of $600,000 and its undivided profits and surplus amounted to about $528,000. It could have built on its own property and thus secured a house adequate to its needs for about $225,000. But the officials of the bank show that such a building would have depreciated in value as time progressed more than the lot would have become enhanced, and that

the economical and businesslike thing to do was to do as they did, secure a more suitable location in a large and handsome office building at a smaller outlay of cash.

The bank officials had something to say about how the building should be constructed and the contemplated cost and use of same, but no harm was done any one in this. The fact that several persons interested in the bank were also interested to a small extent in the Stahlman Building is within itself no evil.

The proof is abundant that it was not the purpose of the bank to promote a sky scraper building, or to own and control stock in such a structure, further than was absolutely necessary and in order to procure an adequate and suitable banking home, commensurate with the growing needs of this thriving institution, situated, as it was, in a growing city. Its paramount purpose in selling the ground and in taking in pay therefor stock in the Mecklenburg Real Estate Company and subscribing the stock of $45,000 in this company was to avoid expensive building, preserve its large surplus, and to secure for a term of years the use of the handsome and commodious banking quarters provided for in the contract.

The question arises, Was the purchase of this $45,000 of Mecklenburg stock by the bank so far in excess of the real powers of a national bank as to put it without the law and forbid its enforcement of the contract to dispose of this stock?

Fourth Nat. Bank v. Stahlman.

National banks are organized under federal statutes and controlled thereby, and this is a federal question, to be determined under the decisions of the federal courts. *California Bank* v. *Kennedy,* 167 U. S., 362, 17 Sup. Ct., 831, 42 L. Ed., 198; *Mapes* v. *Scott,* 94 Ill. 379, 62 L. R. A., 536, note, 12; *Talbot* v. *First National Bank,* 185 U. S., 172, 22 Sup. Ct,. 612, 46 L. Ed., 857; *Portland Nat. Bank* v. *Scott,* 20 Or., 421, 26 Pac., 276.

The federal statute provides that a national bank:

(1)  May purchase and hold such real estate as is necessary for its immediate accommodation in the transaction of its business (R. S., section 5137); and

(2)  May exercise all such incidental powers as shall be necessary to carry on the business, etc. (R. S., section 5136).

A leading federal case touching this question is *Brown* v. *Schlier,* 118 Fed., 981, 55 C. C. A., 475. A national bank in Denver leased a lot from Schlier on which to erect a four-story building and to cost not less than $100,000, the building to become the property of Schlier. The bank agreed to pay an annual rent of $13,975. The building was to contain banking quarters, and the other parts of the building were to be used as offices and rented out by the bank. The term of the lease was for ninety-nine years with a right to renew for fifty years. The bank erected a building costing $305,000 though its capital stock was but $300,000.

Upon litigation involving the question as to whether the lease was *ultra vires,* the court of appeals (eighth circuit) said:

"That a national bank may purchase a lot of land and erect such a building thereon as it needs for the accommodation of its business admits of no controversy under the language of the statute, and we perceive no reason why it may not likewise lease property for a term of years, and agree with the lessor to construct such a building as it desires, provided, always, that it acts in good faith, solely with a view of obtaining an eligible location, and not with a view of investing its funds in real property or embarking them in speculations in real estate. Nor do we perceive any reason why a national bank, when it purchases or leases property for the erection of a banking house, should be compelled to use it exclusively for banking purposes. If the land which it purchases or leases for the accommodation of its business is very valuable, it should be accorded the same rights that belong to other landowners of improving it in a way that will yield the largest income, lessen its own rent, and render that part of its funds which are invested in realty most productive. There is nothing, we think, in the National Bank Act, when rightly · construed, which precludes national banks, so long as they act in good faith, from pursuing the policy above outlined."

Though the lot was leased for one hundred years to erect a larger house than the bank could use, and for the purpose of renting most of it to tenants for office

purposes, and did erect a building costing more than
the capital stock of the bank, it was not *ultra vires,*
because it was a question of a good faith transaction,
in which the bank secured a desirable banking house
and incidentally so constructed the building as to make
it of profit to the bank. That case was taken to the
supreme court of the United States, where this holding
was not disturbed, though the case was there disposed
of on another proposition.

The case of *Brown* v. *Schlier* is referred to, and the
principles there decided adhered to by other courts.
It is well settled that a national bank has power to
lease or purchase real estate for the purpose of ob-
taining good banking quarters when the transaction
is in good faith and solely for that purpose. If a na-
tional bank makes an unauthorized purchase of
real estate, it is held that the federal government alone
can object. U. S. Rev. Stats., secs. 5136, 5137; *Brown*
v. *Schlier,* 118 Fed., 981, 55 C. C. A., 475; Id., 194 U. S.,
18, 24 Sup. Ct., 558, 48 L. Ed., 857; *Wingert* v. *First
Nat. Bank,* 175 Fed., 739, 99 C. C. A., 315; Id., 223
U. S., 670, 32 Sup. Ct., 391, 56 L. Ed., 605; *Weeks* v.
*Int. Trust Co.,* 60 C. C. A., 236, 125 Fed., 370; 3 Rul.
Case Law, sec. 57; 3 Michie, Banks and Banking, pages
1983, 1992; *Farmers' Dep. National Bank* v. *West. Pa.
Fuel Company,* 215 Pa., 115, 64 Atl., 374, 114 Am. St.
Rep., 949; *Union Nat. Bank* v. *Matthews,* 98 U. S., 621,
25 L. Ed., 188.

The federal courts have given a broad and liberal
interpretation to the National Banking Act. Though

the act limits the holding of real estate to such "as shall be necessary for its immediate accommodation in the transaction of its business" yet when there is no ulterior purpose, the directors and officials are given latitude in determining the question.

It is not objectionable that a bank uses its necessary real estate in such way as to put it to the best use possible, consistent with good business judgment.

The proposition is undisputed that one corporation cannot invest its money in the stocks of another corporation, as a general proposition, but this is on the ground that it is unlawful as tending toward monopoly, or as being speculative and outside the scope and purpose of its organization, and not permitted as a matter of public policy. *Marble Co. v. Harvey,* 92 Tenn., 115; *California Bank v. Kennedy,* 167 U. S., 362, 17 Sup. Ct., 831, 42 L. Ed., 198; *First Nat. Bank of Concord* v. *Hawkins,* 174 U. S., 564, 19 Sup. Ct., 739, 43 L. Ed., 1007; *First Nat. Bank v. Converse,* 200 U. S., 425, 26 Sup. Ct., 306, 50 L. Ed., 537; *Merchants' Nat. Bank* v. *Wehrmann,* 202 U. S., 295, 26 Sup. Ct., 613, 50 L. Ed., 1036.

That it is unlawful for a national bank to deal in stocks will not be disputed. This, while not prohibited by the national banking laws in express terms, nevertheless the prohibition is implied from a failure to grant the power. *First Nat. Bank* v. *Exchange Nat. Bank,* 92 U. S., 122, 128, 23 L. Ed., 679; *California Bank* v. *Kennedy,* 167 U. S., 362, 17 Sup. Ct., 831, 42 L. Ed., 198.

A national bank may loan money on shares of other corporations and in order to collect its debt purchase the stock, or it may acquire such stock in protecting itself against loss in compromising a doubtful liability. *Germania Nat. Bank* v. *Receiver*, 99 U. S., 629, 25 L. Ed., 448; *First Nat. Bank* v. *Exchange Bank*, 92 U. S., 122, 23 L. Ed., 679.

So, after all, it is a question of good faith in determining whether a national bank has made an improper investment, and whether the investment was in pursuance of its proper and legitimate banking operations under the limitations imposed by the federal laws.

The object of the restrictions on a national bank to hold real estate or to become interested therein are to keep the capital of the bank flowing in daily channels of commerce; to deter it from engaging in hazardous real estate speculations; and to prevent the accumulations of large masses of such property in its hands to be held as it were in mortmain. The intent, not the letter of the statute, constitutes the law. *National Bank* v. *Matthews*, 98 U. S., 621, 25 L. Ed., 188.

The bank could have built an office building in order to provide a banking home; why could it not effect the same purpose by expending a small fraction of the necessary money, paying a reasonable rental thereafter? Suppose it had built the entire structure. It appears that the investment has not paid dividends, and the stock is quoted at only about fifty cents on the market. It did a more businesslike thing. It conserved its resources for doing a banking business instead of

132Tenn25

embarking in a course of extravagant building. Did the provision that Stahlman should repurchase the $45,000 of stock render the proposition odious to a sense of the legitimate scope of the undertaking? Did it not rather tend less toward monopoly and bad public policy to provide a plan by which this stock should be merely taken for the time being in order to enable Major Stahlman to construct the building and then at a later period relieve the bank of the ownership?

Granting that appellant is correct in his position that a bank cannot acquire stock in other corporations for other than those legitimate purposes connected with the prosecution of its strictly banking business, yet a reasonable interpretation of that principle must be had. This position is based upon the idea that this purchase of stock in the Mecklenburg Company was in aid of a pure promotion scheme and in order to control and dictate the affairs of that company. The premise is not well founded. The fact was not that way. The principles contended for are wise when applied to the reasons to be attained. But we must not lose sight of the reason back of the law. The restriction sought to be invoked here has its inception as a preventive of monopoly and other grave dangers. One railroad cannot purchase stock in a competing line because the tendency is toward monopoly. A bank is not permitted to purchase stock in another bank because it·may tend toward monopoly. A national bank cannot buy real estate not needed in its banking business because the statute creating it has not permitted, on

grounds of public policy, so as to confine its operations within the channels so much needed in the world of finance, and to render it at all times a purely banking institution. No reason has been suggested, and we believe none can be, why a national bank should not be permitted to own a small minority of stock in a building concern in order that it may better its own condition and render it a greater institution for the purposes of its creation. The reasons back of those cases cited by appellants, holding the acts of banks and other institutions *ultra vires* are wholly wanting. This stock was taken as a business measure to get the best banking house possible, in the most reasonable way, as seen by its officials.

If a national bank can buy expensive real estate in a banking district where real estate is costly, and then in order to so use its property as to make it a paying proposition instead of a losing one, as it can clearly do under the well-settled federal authorities, we see no reason why its officials may not be permitted a reasonable discretion in doing a lesser act, to take reasonable stock to get a desirable banking home. If it may build or lease a structure for that purpose, why may it not take a smaller interest, such as undivided interest, or subscribe for stock in order to reach the same result?

We therefore conclude that the chancellor did not err in holding that the contract of Stahlman to purchase this $45,000 of Mecklenberg stock was not *ultra vires* the bank, illegal, against public policy, void, and unenforceable.

This disposes of the first assignment of error.

The second assignment of error raises the question as to whether there was any legal and valid consideration to said stock purchase contract. Defendant says that the only consideration is recited on the face of that contract, viz., that complainant bank would pay its subscription to the Mecklenburg Real Estate Company for the stock theretofore made by it. It is said this is no consideration, because if its agreement to take this stock was not void, it was simply an agreement to pay its own obligation to the corporation, and that this could be no consideration moving between the bank and Major Stahlman. The contract recites the consideration as above stated, but it is very apparent that this was not the only consideration. The obligation was mutual that the bank would sell and Stahlman would buy at par, with accumulated dividends added. So it may be more correctly said that the real moving consideration was not only that Major Stahlman was willing to purchase the stock if the bank would subscribe and pay the building corporation he was promoting therefor, but the agreement of Major Stahlman to purchase was a consideration for the agreement of the bank to sell. This assignment is therefore overruled.

The third assignment of error is that the stock purchase contract was not an absolute agreement to sell the stock at the prices and times stated therein, but only an option to defendant and his wife to take it at the prices and times stated in the event complainant bank did not, in the meantime, dispose of it to others.

The facts in regard to this agreement are stated above. This was not a mere option to sell, but an unconditional agreement upon the part of defendant Stahlman and wife to buy from the Fourth National Bank the said $45,000 of stock, and they were to take and pay for the same, one hundred shares of the par value of $10,000 on December 1, 1909, another one hundred shares December 1, 1910, one hundred shares December 1, 1911, and one hundred and fifty shares December 1, 1912. It is stated in the contract that it is the desire of E. B. Stahlman and wife to buy said stock from the bank. The bank reserves in the agreement an option to sell this stock if it so desires at any time or times to other persons, and thereupon, if all of same should be sold so that the claims of the said bank against E. B. Stahlman and wife were fully paid, that the bank would cancel and surrender this agreement, but that option was a conditional one because it was further provided that Stahlman and wife, or either of them, should have the option to buy said stock at par and accumulated dividends at any time or times before the bank sells it to others, and that at least thirty days' notice of the desire of the bank to sell said stock, or any part thereof, should be given Stahlman and wife, or either of them, of such desire before the bank should have the right to sell said stock to others. It was therefore an unconditional promise upon the part of Stahlman to purchase and an unconditional promise upon the part of the bank, to sell. The bank did have

the right to sell to others if Stahlman did not buy, but this option gave Stahlman preference at all times, and in case the bank did not sell to others, which it has not done, the agreement of Stahlman was obligatory and bound him unconditionally to purchase the stock.   This unconditional agreement upon his part to buy cannot be called an option.   It was somewhat of the nature of a guaranty upon his part that the bank should not lose anything on the Mecklenburg stock, but Stahlman and wife stood ready to purchase the stock at stated intervals.   This assignment is therefore not well taken.

The fourth assignment of error is that this stock purchase contract, if valid and enforceable, should not bear interest as upon a loan, but provides that dividends unpaid shall be included, and inasmuch as no dividends were earned, none can be recovered.

This is not a fair construction of the agreement.   It is provided in the contract that this is guaranteed six per cent. cumulative preferred capital stock, and that if any dividend upon said stock remains unpaid at the time of said purchases to be made by Stahlman and wife, they will also pay the accumulative dividends upon the stock represented by each of said purchases. As long as the six per cent. dividends which this stock should bear were unpaid by the company, it was the obligation of Stahlman to pay same to the bank.   It was the plain meaning that the dividends upon said stock remaining unpaid did not refer to only such dividends as the company might declare, but it was guar-

anteed stock, and was cumulative, so that the obligation of Stahlman and wife was to take care of any dividends unpaid by the company, making it in the nature of a loan to Stahlman and wife.

The fifth assignment of error. is that the chancellor erred in not holding that the provisions of said alleged contract of April 5, 1906, for its own security, were exclusive, and that the bank could not hold or retain other choses in action or property of defendant for its security. This involves the question made in the sixth assignment of error, raising the point whether the pledge contained in the note of defendant of April 10, 1911, for $24,400, of the shares of stock therein mentioned, extended to and entitled the bank to hold said stock for the security of the stock purchase claim of $45,000.

The eighth and ninth assignments involve the sufficiency of the tender made by Major Stahlman on July 31, 1911, just before the bill in this case was filed, and whether the same was kept good pending the litigation. These assignments take the position that the tender, being good, operated to discharge the collateral held by the bank on the loan. It is argued that the bank did not object to the tender as made, except on the ground that it did not include the stock purchase claim of $45,000. If the bank was entitled to retain all this collateral, then the tender was not sufficient to release the same.

Therefore the fifth, sixth, eighth, and ninth assignments of error depend for their solution on whether

the collaterals held to secure the $24,400 note were likewise applicable to the payment of the stock purchase obligation. After all other matters arising in this cause had been determined by the court, only four members sitting, Chief Justice NEILL being incompetent by reason of relationship to one of the parties, the court by the chief justice, requested Governor Rye to appoint another justice to sit in the further determination of the cause, whereupon the governor appointed Hon. W. C. Caldwell, a former member of this court, to act in the place of the chief justice, and the cause was again argued by attorneys on this question and taken under further advisement, the result of which is that the court is of opinion that the collaterals to secure the $24,400 note were, under the contract which is a part of that note, a further security for the payment of the stock purchase obligation, and these assignments, numbers 5, 6, 8, and 9, are therefore overruled.

The views of the court touching this proposition are elaborated and treated in an opinion prepared by Mr. Justice CALDWELL, and which is filed herewith.

The seventh assignment of error is that the chancellor failed to hold and decree that complainant bank was estopped from claiming against defendant Stahlman, as indorser for Morton-Scott-Robertson Company, any more than the sum of $3,851.24, rendered by complainant to defendant on July 29, 1911, as the balance of said debt in response to defendant's request for a statement, including interest to July 31, 1911,

Fourth Nat. Bank v. Stahlman.

of all indebtedness to the bank for which it claimed the right to hold the collaterals mentioned in his note for $24,400, and in failing to credit on said balance of $3,851.24 after July 31, 1911, the collections, thereafter made by complainant bank from said principal debtor on February 14, 1914, of $1,649.07.

In reality this assignment as to the Morton-Scott-Robertson Company debt involves nothing more than a question of estoppel. The credit of $1,649.07 referred to in the assignment of error was allowed in the decree of the chancellor, and there is no ground for objection on that item. The bank had rendered a statement to Major Stahlman which erroneously omitted an item of interest, and the tender made thereupon was only for the amount stated by the bank. While this was a good tender so far as the amount was concerned, it was not an estoppel against the bank that will preclude it. The mistake will be corrected, as no one has been prejudiced by the statement and no element of estoppel can arise.

As regards the legality of the tender made, it was not a valid and binding tender, because it did not include the stock purchase debt, and thus did not release the securities held by the bank, but under all the circumstances of the case, in view of the dispute as to the legal effect of the stock purchase contract, we think the offer of Major Stahlman to pay the $24,400 note was sufficient to exonerate him from having to pay the bank's attorney's fees, as stipulated in this note. There was in reality no litigation as to this item, and, the

main fight being over the stock purchase contract, we think, in equity, the chancellor met the merits when he refused to allow attorney's fees on this note. The assignment by the bank on this point will therefore be overruled.

The debt of the Banner Publishing Company was paid prior to the bringing of these suits. The suit against the Banner Publishing Company does not now involve any live issue. It was originally to have the Banner Publishing Company stock transferred to the bank in order that it might collect the dividends. Evidently the chancellor's decree omitted any action on that phase of the litigation because it had become immaterial at that time.

The final decree found the total indebtedness of defendant to the complainant on June 1, 1914, to be $98,745.67, to be credited with the sum paid into court January 9, 1912, which was $28,336.64, and the accumulated interest thereon, leaving the amount to be recovered and for which the collaterals are liable, $66,-407.15. He ordered the collaterals to be sold unless the amount recovered, including costs, should be paid by September 1, 1914, giving three months within which to pay.

The decree of the chancellor is, in all things, affirmed, and the case will be remanded in order that the decree may be carried out.

MR. SPECIAL JUSTICE CALDWELL delivered a concurring opinion as follows:

The controlling question in this litigation at its present stage, that submitted for reargument, is whether the bank is entitled to hold, as security for a pre-existing debt of E. B. Stahlman and wife, collaterals pledged by him with his personal note to the bank for borrowed money.

It is usual for borrowers of money from banks to secure their loan notes by the pledge of collaterals; and it is allowable in law for the parties to agree at the time that the collaterals so pledged may be held also for the payment of pre-existing debts and subsequent debts, either or both. Jones on Collateral Security, sec. 358.

The scope of the pledge will not be extended beyond that intended by the pledgor; and, if it be written in a blank furnished by the bank, any doubt that may arise as to the proper interpretation of the language used will be resolved in favor of the customer. *Bank v. Wood,* 125 Tenn., 16, 140 S. W., 31.

"The reason for the rule that the language of an instrument is to be construed against the person who proposes it rather than against the person who is invited to accept it is that men are supposed to take care of themselves, and that he who chooses the words by which a right is given ought to be held to a strict interpretation of them, rather than he who only accepts them." *Gillet v. Bank of America,* 160 N. Y., 555, 55 N. E., 292.

On the fifth day of April, 1906, E. B. Stahlman and wife, Mollie T. Stahlman, entered into a written con-

tract with the Fourth National Bank of Nashville, Tenn., whereby they agreed to purchase from the bank and the bank agreed to sell to them four hundred and fifty shares of the preferred capital stock of the Mecklenburg Real Estate Company, at the par value of $45,000, payable in four installments: $10,000 December 1, 1909; $10,000 December 1, 1910; $10,000 December 1, 1911; $15,000 December 1, 1912.

The bank retained the possession of the stock and received, as collateral security for the price of the stock, five insurance policies on the life of E. B. Stahlman, those policies aggregating $45,000.

After that E. B. Stahlman made a note to the bank on one of its blank forms for borrowed money, in the terms and figures following, viz.:

"$24,400.00     Nashville, Tenn., Apl. 10, 1911.

"Ninety days after date I promise to pay to the order of Fourth National Bank twenty-four thousand four hundred and 00/100 dollars, at the Fourth National Bank, Nashville, Tennessee, for value received, without defalcation, and do hereby pledge to any holder hereof as collateral security for the payment of this note, the following property of the present market value as stated, to wit: One hundred shares Banner Pub. Co.; one hundred shares Mecklenburg R. E. Co., Pfd.; twenty-five shares Nat'l Fert. Pfd.; forty shares Nat'l Fert. Com., and do hereby agree, on demand, to deposit with any holder hereof such additional security as they may from time to time require, should the security hereby pledged become unsatisfactory or less valuable.

In case of failure to do so, this note shall forthwith become due and payable (less rebate of interest for the unexpired term at the rate charged), anything hereinbefore expressed to the contrary notwithstanding. Upon default of payment at maturity, whether such maturity occurs by expiration of time or by default in deposition additional security, as above agreed, any holder hereof is hereby authorized and empowered for the purposes of satisfying this note with interest and all costs, and a reasonable attorney's fee, which we agree to pay should same be incurred, to sell, transfer and deliver the whole or any part of said security, including additions thereto or substitutions therefor without any further demand for payment or for additional security, or advertisement or notice. Said sale may be public or private, either at broker's board or elsewhere, at any time or time thereafter, at the option of the then holder hereof. Any holder hereof shall have the right to purchase and become absolute owner, free from all trusts and claims, of any securities pledged hereon including additions and substitutions at any public sale hereunder. It is further agreed that the securitties hereby pledged, including additions and substitutions, shall be applicable in like manner to secure the payment of any other obligations of the undersigned, whether past or future, held by the holder of this obligation. All such securities in their hands shall stand as one general continuing security for the whole of such obligations so that the deficiency on any one shall be made good from the collateral upon the

rest. In case of any sale hereunder the holder shall only be required to account for the net proceeds of said sale, and all parties liable hereon shall remain responsible for any deficiency in payment, and do waive any benefit of all exemptions or privileges under any law now in force or hereafter enacted. All parties hereon waive demand, notice and protest.

"[Signed]        E. B. STAHLMAN."

At the time of the execution of that elaborate note, the entire indebtedness of E. B. Stahlman and wife under the aforesaid stock purchase contract was outstanding and unpaid, as it is now; and E. B. Stahlman was also indebted to the bank as indorser of other notes, amounting to about $25,000, which other notes, except possibly some interest, have since been paid.

Can the bank hold the collaterals, pledged with the $24,400 note of E. B. Stahlman, as security for the stock purchase contract of E. B. Stahlman and wife?

That is what the bank seeks and what Stahlman resists by appropriate pleadings.

The collaterals enumerated in the face of the $24,400. note are worth that amount several times over. As has been seen, they are therein pledged primarily as security for the payment of that note, and in the face of that note, as has also been seen.

"It is further agreed that," those collaterals "shall be applicable in like manner to secure the payment of any other obligations of the undersigned, whether past or future, held by the holder of this obligation."

What does this secondary provision mean in the light of the surrounding facts then and now? Nothing could be clearer than that "this obligation" means the $24,400 note, and that "the holder of this obligation" means the Fourth National Bank, the payee and present owner of that note.

But what do the words, "any other obligations of the undersigned, whether past or future, held by the holder of this obligation" mean?

When that language was employed that bank "held" the $25,000 of notes indorsed by E. B. Stahlman, "the undersigned," and it then "held" and still holds the $45,000 stock purchase contract.

Stahlman's relation to those notes and to that contract was that of debtor, and that relation obviously comes within the language if not within the meaning, of the pledge. Those notes and that contract were other obligations of E. B. Stahlman, in the sense that he was bound in law to meet their requirements. As to the notes he had bound himself as indorser to see them paid; and as to the stock purchase contract he had bound himself to pay the price. He and his wife had contracted to pay the bank $45,000 for the four hundred and fifty shares of stock. That contract made the purchasers of the stock debtors to the bank. It created an indebtedness from them to the bank, and that indebtedness was and is an obligation. Every debt implies an obligation to pay. A legal promise to pay a given sum creates a legal obligation to pay that sum.

Every agreement to buy involves an obligation to pay the stipulated price. This court has said:

"A valid, subsisting obligation may be said to consist of a legal debt or duty." *Cocke* v. *Hoffman,* 5 Lea, 112, 40 Am. Rep., 23.

Though not binding on Mrs. Stahlman because she is a married woman, the stock purchase contract was and is binding on E. B. Stahlman according to its terms, and, being so, it was and is an obligation on his part to pay the bank the $45,000.

However, it is said in behalf of Stahlman, even though the stock purchase contract be binding on him and in one sense an obligation, it is nevertheless not within the meaning of the words of the pledge, "any other obligations," because, as claimed for him, it is not the same kind of obligation as the $24,400 note, in which those words are used, and because it did not arise in the usual course of banking business as did that note.

On the other hand it is said for the bank that the language of the pledge includes every kind of legal obligation of Stahlman to the bank, and that the parties must be held to have contemplated the stock purchase contract as one of his "other obligations" to which the collaterals were to be "applicable."

The books afford numerous cases, tending, in a measure, to support each view. In *Gillet* v. *Bank of America,* 160 N. Y., 549, 55 N. E., 292 (cited by this court in *Bank* v. *Woods,* 125 Tenn., 16, 140 S. W., 31), it appeared that the firm of Dan Talmage's Sons bor-

rowed $35,000 from the Bank of America, executing a note therefor and delivering therewith certain collaterals to insure the payment. The note, which was written on a form furnished by the bank, recited that the makers had—"deposited with the said bank as collateral security for the payment of this or any other liability or liabilities of the undersigned to said bank, due or to become due, or which may hereafter be contracted or existing."

Thereafter the bank purchased from an insurance company a past-due and dishonored note for $5,000 made by the same firm, and sought to hold as security therefor the collaterals deposited with the $35,000 note.

The court refused the relief sought, holding that the provision in the $35,000 note as to collaterals should be construed as referring only to liabilities of the makers of that note "arising out of their ordinary dealings as bank and customer," and not to the customer's note to a third person purchased by the bank. In reaching that conclusion the court said the language of the agreement as to the collaterals should be construed liberally in favor of the makers, as in case of insurance policies and other similar instruments furnished by the company to the customer.

In *Loyd* v. *Lynchburg Bank,* 86 Va., 690, 11 S. E., 104, an unsuccessful effort was made to apply securities pledged with one note in payment of another note. The controlling words of the pledge were stated and construed by the court as follows:

132Tenn.26

"The language, 'if we should come under any other liability, or enter into any other engagement, with said bank, while it is the holder of this obligation,' must be construed to refer to any other liability or engagement of the same kind with the one described in the former part of this contract.''

The language of the pledge, construed in the case of *First National Bank of Omaha* v. *Illinois Trust & Savings Bank* (C. C.), 84 Fed., 34, was:

"And also all other present or future demands of any kind of said bank against the undersigned, due or not due.''

The court held that the bank was not thereby authorized to apply collaterals, deposited with a borrowed money note containing those words, in payment of a previous loan for a term of years on real estate security, which loan had been assumed by a subsequent purchaser of the property. In the course of the opinion the court said:

"They (the parties to the pledge) evidently thought of these words (those quoted above) as including any and all such demands as might arise in the course of commercial banking.''

In *Brown* v. *James*, 80 Neb., 475, 114 N. W., 591, the words of the collateral note construed and applied were:

"For the payment of this or any other liability or liabilities of ours to said firm due or to become due, or which may be hereafter contracted.''

That provision was held not to include a liability arising from a wrongful conversion of money, such a liability not being reasonably within the contemplation of the parties at the time the pledge was made. The court said:

"A fair interpretation of the agreement made in this case demands that it be construed to secure such indebtedness only as might be contracted by the parties in the legitimate transaction of business."

The difference between joint liability and individual liability was the turning point in the case of *Torrance* v. *Third National Bank of Pittsburg,* 210 Fed., 806, 127 C. C. A., 356. Graham and Salusbury executed their joint and several note to their own order for $43,000, and delivered it with their indorsement to the bank. At the same time they pledged jointly owned corporate stock as collateral security for the payment of that note—

"or any other liabilities, of the undersigned to the holder thereof, now due or to become due, or that may hereafter be contracted."

The court held that the surplus of the collaterals could not legally be applied on notes indorsed by Graham and Salusbury individually—that only their joint liabilities were included in the language and meaning of the pledge,

In the case of *Harris* v. *Bank of Franklin,* 77 Md., 423, 26 Atl., 523 (cited in *Bank* v. *Wood,* 125 Tenn., 16, 140 S. W., 31), it appeared that Wilson borrowed $2,000 from the bank, executed his note therefor, and

deposited certain stocks and bonds to secure its payment. The note contained the secondary provision:

"It is also agreed that if I shall come under any other liability, or enter into any other engagement, with said bank while it is the holder of this obligation, that the net proceeds of sale of the above securities may be applied either on this note, or any other of my liabilities or engagements held by said bank, as its president or cashier may elect."

The bank sought to hold those securities for a debt created five months previously, but failed. The court, referring to the language just quoted, observed:

"The plain and obvious meaning of the contract, and that which was contemplated by the parties at the time of its execution, was to cover future liabilities made after the execution of the note, and those entered into at the time of its delivery"

—and not a pre-existing debt.

Other courts have been somewhat less liberal towards the pledgor.

In *Hallowell* v. *Blackstone National Bank,* 154 Mass., 359, 28 N. E., 281, 13 L. R. A., 315, the court held that the words, "any excess of collaterals upon this note (executed by Smith to the bank for a loan) shall be applicable to any other note or claim against me held by said bank," bound the excess of the collaterals as security for acceptances of a firm of which Smith was a member, discounted by the bank before the loan to Smith. The court said:

"It cannot be denied that the acceptances were 'claims against him.' "

Again:

"The clause pledging the property for any other claims against the debtor is not inserted with a view to certain specific debts, but as a dragnet to make sure that whatever comes to the creditor's hands shall be held by the latter until its claims are satisfied." ·

Following that case, the court, in *Norfleet* v. *Insurance Company*, 160 N. C., 329, 75 S. E., 937, held that the words, "any excess of collaterals upon this note shall be applicable to any other note or claim against me held by said bank," included an open account, as well as another note of the pledgor, due to the bank. In the opinion the court observed:

"The language of the contract in this case is exceedingly broad. . . . We can hardly think of any more certain language that could have been employed by the parties to embrace this particular kind of obligation, if they had in mind, and intended at the time, to secure it by the deposit of collaterals."

The last case was reaffirmed without discussion, in *Milling Company* v. *Steverson,* 161. N. C., 512, 77 S. E., 676, where the words, "any other obligation," used in a pledge of collaterals, were held to include "any other indebtedness."

It appeared in *Bank* v. *Lumber Company* (C. C.), 194 Fed., 732, that the Lumber Company, being already indebted to the bank in the sum of about $43,500, bor-

rowed from the bank the further sum of $20,000, executing its note therefor and delivering certain corporate stock as collateral security. One of the questions in litigation which followed was whether the collateral was given to secure the payment of the $20,000 alone, or to secure that note and also the other indebtedness of the Lumber Company to the bank. In deciding in favor of the latter view the court remarked:

"The words used in the note appear to be plain and unambiguous, for in the note it is stated: 'The undersigned having herewith deposited as collateral security for the payment of this note and every other liability of the undersigned to said bank, direct or contingent, due or to become due, or which may hereafter be contracted or existing.' . . . Language not as comprehensive nor as specific as that employed in this note in question has been held by several of the highest courts of the States to mean that the collateral was not given for the specific indebtedness of the note alone, but for all of the indebtedness" (citing cases from Alabama, Georgia, Illinois, Ohio and Massachusetts).

In *Wilson* v. *Carothers* (Ky.), 43 S. W., 684, it was disclosed that Carothers & Bro. were indebted to Wilson and Muir by two notes for $1,000 each, and those notes were signed by other persons as sureties. While those notes were outstanding Carothers & Bro. executed other notes to Wilson and Muir for other sums and delivered to them certain collaterals—

"as security for the payment of our notes this day executed, or any other unsecured liability, or liabilities of ours to Wilson & Muir."

In construing that language, which it was contended on one side did not include the two $1,000 notes, the court said:

"We think the clause, 'or liabilities of ours to Wilson & Muir,' is broad enough to include any liabilities which Carothers & Bro. were under to Wilson & Muir"

—and hence includes the two $1,000 notes though they were signed by other persons as sureties of Carothers & Bro.

Our court of chancery appeals in the case of *Hanover National Bank* v. *Brown,* 53 S. W., 206 (affirmed orally by this court), held that the excess, if any, of collaterals pledged for the payment of a note to the bank for $25,000 of borrowed money, "or any other liability or liabilities of ours to the said bank, due or to become due," could be applied by the holder on notes of the maker previously rediscounted for him by the holder.

The ruling in that case was approved in *Bank* v. *Wood,* 125 Tenn., 16, 140 S. W., 31, where it was decided, in an opinion by Mr. Justice Green, that a written pledge of additional collaterals was controlled by its own terms, and not by general provisions as to additional collaterals and renewals found in the face of a collateral note, previously executed and subsequently renewed. General provisions in the note were not allowed to "override, add to, or vary the terms of a definite written agreement particularly witnessing

the pledge of this property," as did the agreement pledging additional collaterals.

In the opinion the court in that case further said:

"While it has been held in *Tennessee* (*Hanover National Bank* v. *Brown,* 53 S. W., 206), that these provisions in a note authorizing a bank to hold, as security for a general indebtedness, property pledged for a particular debt are valid, nevertheless an examination of the authorities shows the rule to be that such an agreement will not be construed so as to extend the obligation beyond that intended by the pledgor; and, if such agreement is on a printed form furnished by the bank and signed by its customer, and any doubt arises as to its proper interpretation, it will be construed in favor of the customer." 125 Tenn., 16, 140 S. W., 31.

None of the numerous cases mentioned by us, nor any of the many other kindred cases that could be mentioned, furnish an exact parallel to the present case, either in the words of the pledge or in the attendant facts; none of them afford a conclusive criterion throughout for the decision of this case. After all, and properly, this case must stand and must be decided upon its own particular facts, which are different in some aspects from all other cases.

The $24,400 note, with its several provisions, including those in reference to the collaterals now in question, is a contract; and, as in other contracts, the intention of the parties, when ascertained under proper rules of construction, if lawful, will be enforced by the court.

It is well observed, in a case already mentioned, that:

"In the construction of written contracts it is the duty of the court, as near as may be, to place itself in the situation of the parties, and from a consideration of the surrounding circumstances, the occasion and apparent object of the parties, to determine the meaning and the intent of the language employed. Indeed, the great object, and practically the only foundation of the rules for the construction of contracts is to arrive at the intention of the parties. This is a most conspicuous and far-reaching rule, and involves the nature of the instrument, the condition of the parties, and the objects which they had in view, and when the intent is thus ascertained, it is to be effectuated unless forbidden by law. 'Contracts are not to be interpreted by giving a strict and rigid meaning to general words or expressions without regard to the surrounding circumstances or the apparent purpose, which the parties sought to accomplish.' " *Gillet* v. *Bank of America,* 160 N. Y., 555, 556, 55 N. E., 292.

Applying that familiar rule of construction and considering especially the fact that this contract was written in a blank form furnished by the bank to its customer, we have come to the conclusion that the language employed by the parties in this case means and was by them both intended to mean, that the collaterals pledged with the $24,400 note should, after the payment of that note, be "applicable" also "to any other obligations" of E. B. Stahlman to the bank, including the $45,000 stock purchase contract.

This we think does not extend the scope of the pledge "beyond that intended by the pledgor," but is in accord with the intention of both of the parties. The language of the pledge is very broad and comprehensive. It could not well have been more so. Viewed in the light of the surrounding facts and circumstances, the meaning of that language is so plain and obvious as not to admit of any doubt to be resolved in favor of the pledgor, as should be done in case of doubt, the blank in which the pledge is written having been furnished by the bank.

It is only where the language is ambiguous and the meaning in doubt, or where the meaning to such effect is clear, that the secondary provision in a collateral note made to a bank by its customer will be limited to other liabilities, or other obligations, "arising out of their ordinary dealings as bank and customer" (*Gillet* v. *Bank,* supra), or "in the course of commercial banking" (*First Nat. Bank* v. *Ill. T. & S. Bank,* supra), or "of the same kind with the one described in the former part of the contract" (*Loyd* v. *Lynchburg Bank,* supra), or joint and not individual (*Torrance* v. *Third Nat. Bank,* supra), or simultaneous and future but not preexisting (*Bank* v. *Harris,* supra). Where the language is plain and the meaning obvious to such effect, the court must hold that the pledge includes all other legal liabilities or obligations.

Being already indebted to the bank in the matter of the $45,000 stock purchase contract and also as indorser of $25,000 of notes of other persons (since paid), E. B.

Stahlman executed to the bank the $24,400 note, pledging therewith the collaterals now in question, they being of a market value several times as great as that note. The collaterals were pledged first to secure the payment of that note, and then "to secure the payment of any other obligations of the undersigned, whether past or future, held by the holder of this obligation;" and this stock purchase contract was then one of the pledgor's past obligations, which he manifestly intended to secure, and but for the securing of which he, as an experienced and intelligent business man, would have withheld the larger part of the collaterals actually pledged.

That such was the intention of the parties is emphasized, we think, by the next sentence in the note, as follows:

"All such securities in their hands shall stand as one general continuing security for the whole of said obligations, so that the deficiency on any one shall be made good from the collateral upon the rest."

Applied to the facts of this case that provision means that any deficiency that may occur in the collaterals put up with the $45,000 stock purchase contract shall be made good from the collaterals pledged with the $24,400 note.

It may be well to remark, in reference to the language of this pledge, that it cannot properly be construed to mean that another bank to which the Fourth National Bank, the payee, might have transferred the $24,400 note with its collaterals could hold those collaterals as

security for other debts which Stahlman might have created with that other bank. To so construe the pledge would be to extend its scope "beyond that intended by the pledgor," and to do what the court said, in *Bank* v. *Wood,* 125 Tenn., 16, 140 S. W., 31, cannot be done. Such other debts to such other bank in the supposed case could not be held to have been in the contemplation of the parties when the collaterals were put up with the $24,400 note; hence they could not have the benefit of that pledge. Only that note and any other obligations of Stahlman, past or future, to the Fourth National Bank can reasonably be said to have been within the contemplation of the parties; and for that reason only that note and such other obligations could fall within the scope of the pledge. Another bank holding that note and those other obligations, including the stock purchase contract, would be allowed to hold these collaterals for that note and those other obligations, because all of them were contemplated when the pledge was made; but the collaterals could not be held for other debts created with another bank, because such other debts were not contemplated.

The observation may also be made, in construing the provisions of this pledge, that a surety or an indorser on the $24,400 note, had there been one and had he paid the note, would by the payment, *ipso facto* nothing else appearing, have become entitled to be subrogated to the place of the bank as to these collaterals to the extent of the payment made; and such right of subrogation could not be defeated by the application

of the collaterals on any other debts to the bank, the collaterals being pledged primarily, as we have seen, for the payment of the $24,400 note.

Mr. Justice Williams delivered a dissenting opinion as follows:

Unable to agree with the majority of the court in its ruling as to the construction of the language of the $24,400 note in relation to the indebtedness secured by certificates of stock pledged immediately as collateral thereto, the grounds of dissent shall be expressed as briefly as practicable.

This court is committed by the case of *Bank* v. *Wood*, 125 Tenn., 16, 140 S. W., 31, to the view, now generally held, that this language must receive a construction in favor of the pledgor if there be room for construction.

The identical language of the pledge for construction, or its equivalent in substance, is in comon use by the bankers of all the States of the Union, and the effect to be given to it is far-reaching.

It is the contention of the bank that the phrase in the note executed by E. B. Stahlman, "the securities hereby pledged, including additions and substitutions, shall be applicable in like manner to secure the payment of any other obligations of the undersigned whether past or future, held by the holder of this obligation," is effective to secure a previous obligation of E. B. Stahlman and wife to take over from the bank $45,000 of the preferred capital stock of a real estate corporation; which contract ran for the long period of seven years and which further provided for its own

security by collaterals—insurance policies on the life of E. B. Stahlman pledged therewith.

In my view the authorities cited in the opinion of the majority amply demonstrate that the certificates of stock in the Banner Publishing Company, hypothecated with the $24,400 note, may not be held to await the maturity of or to secure this earlier obligation. Only two of those cases at all militate against this view, *Hallowell* v. *Blackstone Nat. Bank,* 154 Mass., 359, 28 N. E., 281, 13 L. R. A., 315, and *Wilson* v. *Carothers* (Ky.), 43 S. W., 684, and of these it may be remarked that the first was by a divided court, and is directly contrary to the later cases, and the second never reached the dignity of being officially reported.

The other cases either are colorless on the real point here in contest or plainly sustain the pledgor's position in the instant case. The rule to be extracted from them is that the words, "other obligations held by the holder of this obligation," refer to obligations of like character as to makership, and as to the channel in which the paper runs—in the pending case the reference being to other obligations incurred "in the course of commercial banking" (*First Nat. Bank of Omaha* v. *Illinois Trust & Savings Bank* [C. C.], 84 Fed., 34), or obligations of a customer to a bank in the ordinary course of banking business (*Gillet* v. *Bank of America,* 160 N. Y., 549, 55 N. E., 292, cited with approval by this court in *Bank* v. *Wood,* and the rule of which is adopted as sound by Mr. Jones in his standard work on Collateral Securities [3d Ed.], sec. 361b).

Passing without further comment the fact that the earlier obligation was that of Stahlman and wife and the later one that of Stahlman alone, it seems clear that the former was in no sense an obligation incurred by Stahlman as a customer in the ordinary course of commercial banking. Indeed, it is to be observed that the court in this case has itself treated the stock purchase transaction as one not free from serious question as to its being wholly nonbanking in character —*ultra vires* the bank. Certainly it cannot be said to fall within the class of ordinary commercial banking transactions, and as certainly that it was not executed by Stahlman as a customer of the bank. He dealt in a distinct capacity.

It is to be noted in this connection that that contract was one that ran for a term of years, as was the case in *First Nat. Bank of Omaha* v. *Illinois Trust & Savings Bank,* supra. Let it be assumed that the $24,400 bank note had been executed in 1906, early in the life of the stock purchase contract. The holding of the majority can but mean that the hypothecated shares of stock of the pledgor in the Banner Company would continue to be held in pledge until the end of that long term, despite the full payment to the bank of the note and a demand for their surrender. Is it a sound policy that would admit of this, for the security of a non-banking obligation? Corporate stock, which is subject to rapid fluctuations in value, should be kept as liquid as possible. It is not to the advantage of the commercial interests of a commonwealth that shares be

tied up for years by a construction of the note contract, especially when that is not sustainable on authority.

Another angle may be presented by another assumption for test purposes: That, as is not infrequently the case, a note with similar provisions respecting collaterals has also a surety or indorser, and that at maturity the surety or indorser is compelled to pay the note. Is it fair lines for a court to read the surety that he must be denied subrogation and possession of the pledged shares after payment and until such a land stock contract has matured? It may be fair to impute to such a surety knowledge that the pledgor principal has or may have other obligations, executed by him in the course of banking as customer, outstanding to the pledgee, which are secured in priority to any right of his to subrogation; but it is going too far to hold that the surety must have had in contemplation as a part of his risk such a long-time, optional contract of purchase of shares in a real estate corporation.

It is fairly evident that the majority was not unappreciative of the hardship that would be thus involved, and they attempt an escape from it by false reasoning. It is argued in the prevailing opinion that "such right of subrogation could not be defeated by the application of the collateral on any other debts to the bank, the collaterals being pledged primarily, as we have seen, for the payment of the $24,400 note." It is submitted that neither on reason nor by authority

may the hypothetication be deemed to be primarily for the payment of the note as contradistinguished from the land stock contract, if the security of the latter be granted. In terms the pledged shares would be "applicable in like manner" to secure the latter and the former. Had such terms been unexpressed, the authorities are uniform to the effect that there is no such primacy or priority as between the indebtednesses or obligations so secured. Mr. Jones says on the point:

"Thus, where one was indebted to a bank for several loans made at different times, and at the times when two of the loans were obtained he pledged certain notes as collateral security under an agreement declaring, 'that for the punctual payment of this or any other sum which I have obtained, or may hereafter obtain, on loan or discount from said bank, these notes are hereby pledged and made liable,' . . . it was held that the bank was under no obligation first to apply the security to the payment of the loan obtained when the security was given, that the language of the contract could not be construed as giving a preference or priority to any particular debt, and that the creditor had a right to apply the proceeds of the security as he saw fit." Collateral Securities (3d Ed.), sec. 355b; *Richardson* v. *Washington Bank,* 3 Metc. (Mass.), 536; *Fall River Nat. Bank* v. *Slade,* 153 Mass., 415, 26 N. E., 843, 12 L. R. A., 131.

And the right of the surety is in such case postponed until he has paid or tendered "the whole amount of the debts for which the security was given." Same

132Tenn27

authorities; *Titcomb* v. *McAllister*, 81 Me., 399, 17 Atl., 315.

At first blush the ruling in favor of the appellee on this point may be thought to be altogether favorable to banks, but it is not improbable that practical bankers may entertain a contrary view, as they bring under consideration the fact that a pledgor who is under a long-time non-banking obligation to a bank as was appellant Stahlman cannot afford to borrow on short-time notes collateral in form from that institution, without experiencing the embarrassment of having the securities hypothecated tied up. The tendency of the precedent will be to cause such an one to go to some other bank for his current accommodations which, as bankers know, may well mean the weaning away of the customer to the other bank. A ruling that has such a tendency, in my view, is not based upon sound policy, and as has been seen it runs counter to the precedents.