## BRADBURN v. WYOMING TRUST CO. OF CASPER, ET AL.

(No. 1969; December 22, 1936; 63 Pac. (2d) 792)

74

For the plaintiff in error, there was a brief by *E. E. Enterline* and *Madge Enterline* of Casper and oral argument by *E. E. Enterline*.

For the defendant in error, The Casper National Bank, there was a brief by *Hagens & Wehrli* of Casper, and oral argument by *Mr. Wehrli.*

RINER, Justice.

The district court of Natrona County having rendered its judgment adverse to H. F. Bradburn in an action wherein he was plaintiff and The Wyoming Trust Company of Casper, a corporation, The Casper National Bank, a corporation, The First Trust & Savings Bank of Casper, a corporation, and Philip E. Winter were defendants, Bradburn as plaintiff in error has brought the record here for review by proceedings in error. Winter having died during the pendency of the litigation, Alta S. Winter as administratrix of his estate was substituted in his stead. Bradburn may conveniently be referred to hereinafter at times as the "plaintiff," and for brevity in mentioning the corporate defendants, The Wyoming Trust Company of Casper will be designated as the "Trust Company"; The First Trust & Savings Bank of Casper as the "Savings Bank"; and The Casper National Bank as the "National Bank." Briefs were filed and arguments had in this court on behalf of only Bradburn and the National Bank.

The facts involved are very little in dispute and are substantially these: On March 16, 1931, in renewal of an existing obligation, Philip E. Winter and Alta S. Winter, his wife, executed and delivered to the Savings Bank their joint and several promissory note, payable to its order, in the sum of $4,550.00, due six months after date, with interest at eight per centum per annum. To secure the payment of this obligation, the obligors delivered and pledged to said Savings Bank

four stock certificates of the Cities Service Company, representing 195 shares of stock therein, two stock certificates of Dallas Dome Wyoming Oil Fields Company, representing 1250 shares of stock in that corporation, and also executed and delivered to said payee a second mortgage upon Lot 7 in Block 72 in the City of Casper, Wyoming. On March 22, 1933, in renewal of the note aforesaid the same obligors executed and delivered to the order of the same payee their joint and several note operating as an extension of payment agreement for six months after date, in the amount of $3,750.00, then due, with the same interest rate.

August 28, 1931, Philip E. Winter procured a loan from the Trust Company in the sum of $1,800.00. Of this amount $1,650.00 was sent to H. F. Bradburn, his son-in-law, who lived in Oklahoma City, Oklahoma, and $150.00 was credited to Winter's personal account. To obtain this loan the latter executed and delivered to said Trust Company his promissory note therefor, and deposited and pledged with it a certain certificate of shares of stock of the United States Gypsum Company, which had been theretofore issued in his name. The bank officer who made the loan testified that Winter, at that time, never intimated that any one but himself had an interest in this stock. This obligation was renewed from time to time, some payments in reduction thereof having been made, and on May 26, 1933, Winter again renewed the obligation by executing to the Trust Company his note in the sum of $1,532.90, due on demand, said note containing the following provisions:

"And there is hereby and herewith, by and for the undersigned, delivered, pledged and deposited as collateral security for the payment of this note and also of all other present and future demands of any and all kinds, and of every nature whatsoever, of the holder hereof, against the undersigned, now owing, or which may hereafter be owing, and whether now or hereafter

contracted, the following property, viz: Certificate No. C 253 for 100 shares U. S. Gypsum Co."

June 10, 1933, the Savings Bank and also the Trust Company merged with the National Bank, and for full value sold to it without recourse both the joint and several note and the extension renewal thereof of Winter and wife, as above described, and also the individual note of Philip E. Winter aforesaid. All collateral stock certificates were delivered to and have since been held by the National Bank. The second mortgage securing the note of Winter and his wife was not formally assigned to the purchaser of the obligation, which together with the pledged shares of stock already mentioned it secured. The National Bank in purchasing all these obligations took into account the value of the United States Gypsum Company stock, and, as the president of the National Bank testified, regarded the security on the Savings Bank note aforesaid inadequate to secure that note, but considered that the security on all the notes taken together would be sufficient to protect them under the above quoted clause, which aside from the description of the securities appeared in both the Trust Company and the Savings Bank notes.

November 8, 1933, Bradburn, for the first time to the knowledge of the corporate defendants, asserting that he alone owned the stock, made a demand upon the National Bank for its surrender to him, at the same time tendering to it the amount due on the Trust Company note only. This demand was refused, the reason assigned being that the National Bank as holder of all the obligations aforesaid claimed the right to detain the demanded stock as security for the payment of the joint and several note of Philip E. Winter and wife as well.

On January 9, 1934, the plaintiff brought his action in the district court of Natrona County, wherein by

his petition, to summarize, he claimed to be the owner of the United States Gypsum Company shares of stock aforesaid, and alleged that Winter had pledged said stock as collateral security for the payment of the Trust Company note by and with his (Bradburn's) consent; further that Bradburn had made a tender of the amount due on the Trust Company note to that company and also to the National Bank, which tender had been refused. Judgment for the recovery of said certificate of shares of stock was prayed upon payment of the amount due from Winter on the 8th day of November, 1933, under said Trust Company note; and that in the event delivery of said stock certificate could not be made by the defendants that plaintiff recover stated damages therefor.

March 14, 1934, Philip E. Winter filed an answer admitting the allegations of plaintiff's petition and joined in the prayer for judgment contained therein.

Thereafter, and on July 12, 1934, the Trust Company answered plaintiff's petition, stating in substance that it had transferred for value the note of Philip E. Winter dated May 26, 1933, and the certificate of shares of stock in the United States Gypsum Company to the National Bank. The execution of the said note, the delivery of the stock certificate as collateral therefor was admitted, and denial of the other allegations of plaintiff's pleading made. The prayer of the answer was for judgment of dismissal of the action. By his reply plaintiff denied the new matter alleged in this answer.

The National Bank filed its amended answer September 13, 1934, wherein, to state the matter briefly, after sundry denials and admissions as a first defense, in its second defense, it set forth the sale of the notes to it as recited above, and also the delivery to it of the securities mentioned in said notes, and claimed the right to hold the United States Gypsum Company stock

for the payment of both the Trust Company note and the Savings Bank note, already mentioned. A general demurrer interposed by plaintiff to this second defense was overruled, and on January 15, 1935, plaintiff then replied, in substance denying the allegations of that pleading.

May 31, 1935, Alta S. Winter, as administratrix of Philip E. Winter's Estate filed her answer adopting that theretofore filed by her husband.

Sometime prior to March 7, 1934, and during the pendency of this litigation, Mr. Cather, the vice-president of the National Bank, who previous to June 10, 1933, had been president of the Trust Company, had had some conversation with Philip E. Winter relative to obtaining a loan from the Home Owners' Loan Corporation on the real property covered by the second mortgage aforesaid, and subsequently some correspondence concerning the same subject. Mr. Cather testified, without objection, at the trial of the case, in substance, also: That this loan was finally consummated in the sum of around $6400.00, the Home Owners' Loan Corporation receiving a mortgage from Winter to secure that amount; that from the proceeds of this loan $1800.00 went to the first mortgage, $2200.00, roughly, went to take up assessments, $400.00 or $500.00 went to a furnace company that held a lien on the property; also an amount was paid for delinquent taxes on the property, which witness could not recall as to the exact sum, and after all these were paid the National Bank received what was left of the $6400.00 loan; that the amount the National Bank received from the sale of the Home Owners' Loan Corporation bonds was not exactly shown on the note endorsement of credit; that said bank received thereby and applied on the note of Winter and wife the sum of $1633.75 only, as it was compelled to pay out interest to the first mortgagee, which the holder of that obliga-

tion had neglected to include in the transaction, and also for an abstract of title and the gross cost of the loan; that he (Cather) took up the matter with Philip E. Winter, and in the negotiations with the latter prior to the time the transaction was concluded, Cather informed Winter as to the approximate amount that would be available for application on the second mortgage; that Winter agreed to the transaction as it was carried out and appeared to be very grateful.

On March 23, 1934, in connection with this Home Owners' Loan Corporation transaction, the president and cashier of the Savings Bank, which appears to have still been continued as a corporate entity, executed and delivered to the Home Owners' Loan Corporation on behalf of said Savings Bank an assignment of the second mortgage aforesaid, the instrument stating also, "said assignor further selling, assigning, transferring and conveying unto assignee the notes and obligations in said mortgage described, all without recourse on it in any event or for any cause."

Mr. Cather further testified that the National Bank made no agreement with Winter to release the entire obligation on the joint and several note of Winter and wife to the Savings Bank on receipt of the $1633.75; that said Bank never released said note in its entirety; and that neither said note nor its extension agreement had ever been out of the possession of the National Bank until they were brought into court on the trial. This testimony was objected to by the plaintiff as incompetent, irrelevant and immaterial and as an attempt to contradict a written instrument, the assignment above described.

Other facts shown by the record will be mentioned as they may be deemed necessary to a full understanding of the matter.

On May 17, 1935, a trial was had to the court without a jury, and on May 28th following, the court en-

tered its judgment finding generally in favor of the National Bank and against the plaintiff, adjudging that plaintiff take nothing by his petition, and dismissing with prejudice plaintiff's action against the Trust Company and the Savings Bank. Plaintiff in due form saved his exceptions to the adverse findings and judgment.

The sole question in the case is whether the National Bank under the facts presented has the right to retain the United States Gypsum Company stock as security not only for the payment of the Trust Company note, aforesaid, but also as security for the joint and several obligation of Philip E. Winter and wife originally given to the Savings Bank. Plaintiff asserts that the district court was in error in upholding the right of the National Bank to do this.

We agree that the rule must be as cited by plaintiff from 49 C. J. 936, that:

"The terms of the contract, as construed by the general rules of construction, control as to the particular person or persons secured by a pledge. A pledge given to secure a particular debt will protect not only the immediate pledgee, but also others entitled to the debt.

"As to what debts or liabilities are secured by a pledge is controlled by the intention of the parties, as determined from the whole transaction between them, and where the contract, prepared by the pledgee, is not clear as to whether the collateral pledged shall secure a particular indebtedness, it must be construed in favor of the pledgor."

And the same text at page 903 says also that:

"A pledge may be made not only to secure debts and obligations created at the time of delivery, but also to secure preexisting debts, future loans and advances, and contingent liabilities. A contract making its collateral subject to the payment of other indebtedness, besides the one for which the collateral is particularly pledged, is a valid agreement, and the right to sell the

collateral for the non-payment of the other indebtedness is equally as valid."

The National Bank takes its position in this litigation in reliance upon the language quoted above from the Trust Company note signed individually by Philip E. Winter. It is perhaps difficult to conceive of language more all-embracing in its purport relative to what obligations were intended to be secured than the statement contained in said note that the United States Gypsum Company stock was to be held as "security for the payment of" the Trust Company note "and also all other present and future demands of any and all kinds, and of every nature whatsoever, of the holder" of that note "against the undersigned, now owing, or which may hereafter be owing, and whether now or hereafter contracted."

Plaintiff directs our attention to 49 C. J. 940-941 as indicating a legal principle which demonstrates that the ruling of the trial court upon plaintiff's general demurrer to the National Bank's pleaded second defense was error. That text there says:

"Where the property is pledged as security for the debt of a particular debtor, unless the pledgor consents thereto, it cannot be held as security for the debt of another person, or for a debt of the original debtor in a different capacity."

This statement of the text is followed by illustrative examples of the application of this principle. It is there pointed out that where a pledge is made to secure a joint debt of two or more persons, it does not operate to secure a debt of one of them individually; that property pledged for a debt due an individual cannot be held for a firm debt; that if property is pledged to secure an obligation due from an individual, it cannot be applied to a partnership debt, "except," says the text, "where the pledge includes a clause covering general indebtedness, in which case it may be held to

apply to a debt of the pledgor's firm, to the pledgee, on the ground that each partner is severally liable for partnership debts"; that property deposited with a creditor on a particular trust cannot be held by him as security for his own debt; that where a pledgee knows that the property pledged was held in trust by the pledgor, he cannot retain it as security for the pledgor's individual debt; and that an assignee of a secured debt from the pledgee cannot avail himself of the collateral, or any surplus, in satisfaction of his own unsecured claims against the pledgor, "unless," the text proceeds to qualify this last statement, "the contract of pledge runs to the holder or holders of the original obligation." The exceptions given in the foregoing illustrations naturally accord with the further statement of the cited text, 49 C. J. 937:

"By special agreement the pledgor may consent that property pledged as security for a particular debt shall be held by the pledgee as security for other obligations already existing, or to be thereafter contracted."

We have examined carefully all the authorities cited by plaintiff, and in none of them appear to have been considered anything like the all-inclusive language of the pledge agreement quoted above, as contained in the Trust Company note relative to the United States Gypsum Company stock. For example, the decision in the case of Heffner v. First National Bank of Huntington, 311 Pa. 29, 166 Atl. 370, 87 A. L. R. 610, is relied on and quoted from in extenso as in point here. We do not think it is. There it was held that a pledge of stock owned by a wife to secure the payment of the joint and several note of herself and her husband, could not be applied to the payment of other notes, which her husband had signed with third parties, under an agreement whereby the stock aforesaid was pledged for the payment of said joint and several note "or any other liability or liabilities to said holder

thereof." The court very properly concluded that this clause meant only the liabilities of the signers of the note, i. e., the husband and wife, and could not be construed to embrace liabilities of the husband and other parties to the holder.

In the case at bar, we find the stock originally pledged to secure not only the payment of Philip E. Winter's individual liability on the Trust Company note, but also those other demands of the "holder" as described by the language of the pledge under consideration. It is evident the National Bank is but claiming the right to apply this stock as collateral to another individual liability of Philip E. Winter, which it holds and which it acquired at the same time it bought the Trust Company note, for as we have seen the Savings Bank note is not merely the joint, but the joint and *several* obligation of Philip E. Winter and his wife. Under the extremely broad terms of the pledge we think it might properly do this.

Where a collateral agreement attached to a note read:

"Having deposited with the said Company as collateral security for the payment of this and all other liabilities of the undersigned to the said Company due or to become due, or which may hereafter be contracted or existing, whether incurred directly or indirectly by the undersigned to the said Company including as well promissory notes, bills of exchange and other evidences of indebtedness in writing made, endorsed, or accepted by the undersigned and purchased or owned by said company,"

and the Company had theretofore acquired another note of the pledgee, it was held in Brotherhood of Locomotive Engineers Securities Corporation of New York v. W. L. Shepherd Lumber Company, et al., 51 Fed. (2d) (C. C. A. 5th Circuit) 153, that the language of the pledge was broad enough to place the collateral back of both notes.

The language in the pledge agreement now before us is perhaps more comprehensive even than that last above quoted. As further supporting our view that the National Bank correctly asserted its claim of right to hold the United States Gypsum Company stock under the pledge agreement aforesaid until the Savings Bank extension note was paid, see also Hallowell v. Blackstone National Bank, 154 Mass. 359, 28 N. E. 281; Norfleet v. Pamlico Insurance & Banking Co., 160 N. C. 327, 75 S. E. 937; Fourth National Bank v. Stahlman, 132 Tenn. 367, 178 S. W. 942; Foster v. Abrahams, 74 Calif. A. 521, 241 Pac. 274; Richardson v. Winnisimmet National Bank, 189 Mass. 25, 75 N. E. 97; Oleon v. Rosenbloom, 247 Pa. 250, 93 Atl. 473; Mulert v. National Bank of Tarentum, 210 Fed. (C. C. A. 3rd Circuit) 857; Stover Bank v. Welpman, 323 Mo. 234, 19 S. W. (2d) 740.

But it is further urged for the plaintiff that as the Savings Bank, on March 23, 1934, and after this litigation began, assigned the second mortgage above described to the Home Owners' Loan Corporation and the note it secured was also recited in that assignment as having been transferred, the ownership of the Savings Bank note was not in the National Bank "at any time after the execution of the assignment," and, hence the United States Gypsum Company stock could not be held to be applied on its payment. But at the time of this assignment, it will be noted, the Savings Bank did not have title to the Savings Bank note, it having theretofore on June 10, 1933, transferred it to the National Bank for full value. Having no title to the instrument it could convey none. It is familiar law that a mortgage being only an incident to the debt it secures, a transfer of the latter will carry with it the mortgage security and operate as an equitable assignment thereof unless it is agreed otherwise. 41 C. J. 672 and cases cited.

As said by Mr. Justice Swayne in Carpenter v. Longan, 16 Wall. 271, 21 L. Ed. 313, "An assignment of the note carries the mortgage with it, while an assignment of the latter alone is a nullity. Jackson v. Blodget, 5 Cow., 205; Jackson v. Willard, 4 Johns., 43." So 2 Jones on Mortgages, 8th Ed., 413, Section 1020, says: "The mere delivery of a mortgage deed without the bond or note does not constitute a transfer of it either by way of sale or pledge, though the full consideration was paid or money was advanced upon it. There is in such case a presumption against any transfer."

Under these authorities it is plain that the assignment aforesaid legally transferred nothing to the Home Owners' Loan Corporation. Nevertheless, it is suggested in behalf of the plaintiff that the defendant National Bank "received the fruits of the transaction" between it, the Home Owners' Loan Corporation and Philip E. Winter, whereby that corporation in return for the Mortgage assignment aforesaid delivered bonds to the said National Bank, which were sold and applied to Winter's debt on the extension of the Savings Bank note held by that institution. It is insisted that because of this fact the National Bank "is in no position to contend that it still owns the extension note or agreement." We cannot accede to this view. The transaction must be looked at in its entirety and the evident intention of the parties must be gleaned both from what they did and from what they said. When that intention is ascertained it should control in determining the true character of the dealing.

It has already been observed that the attempted assignment by the Savings Bank to the Home Owners' Loan Corporation as a matter of law transferred no title to either the Savings Bank extension note or the second mortgage; equitably, however, when a person not obligated to pay a mortgage advances money to

do that, the payment will operate as an assignment of the mortgage and not as an extinguishment of the debt where that was the evident intention of the payor. 41 C. J. 678, Sec. 692, and extended list of cases cited. In the case at bar it was the obvious purpose of the parties to the transaction to refund the Philip E. Winter and wife indebtedness on said note by calling in both the first and second mortgages which were outstanding upon Lot 7 of Block 72 in the City of Casper, to clear the title to said property by liquidating the assessments, mechanic's and tax liens thereon, and to substitute in lieu thereof a new mortgage by the same parties in the sum of approximately $6400.00. This intention was carried out, although, as has been noted, the Home Owners' Loan Corporation really obtained at most nothing more than an equitable assignment of the second mortgage. The first mortgagee was paid in full, principal and interest, from the proceeds of the Home Owners' Loan Corporation bonds, as were also the assessments, mechanic's and tax liens on the property, while the equitable assignment of the second mortgage was paid for by what was left.

It seems plain to us that not one of the parties to the transaction ever intended that by the assignment of the second mortgage aforesaid the entire debt, for which it was only partial security, should be paid. It was not the intention evidently of the Home Owners' Loan Corporation, for it turned over its bonds to the National Bank without demanding the extension Savings Bank note, which the second mortgage undertook to secure. It was not the intention of the National Bank, for it never parted with that note from the time it purchased it on June 10, 1933, until it was brought into court on the trial of this case, and said bank promptly credited the proceeds it received from the said bonds on the obligation it held and continued to hold, and it never surrendered the certificates of shares

of stock additionally pledged to secure the payment of this note, nor was it asked to do so by any one. It was not the intention of the Savings Bank, for it did not own the note at the time it made the purported transfer thereof. It was not the intention of Philip E. Winter, for he was advised of the manner in which the proposed transaction would be conducted, expressed his approval thereof and executed the new mortgage required to obtain the issuance of the Home Owners' Loan Corporation bonds. When it is said that the National Bank took the fruits of the transaction, in other words, ratified it, the bank was in fact ratifying only a transaction whereby a part of the security on the note above mentioned, i. e., the second mortgage security, was transformed into cash and applied pro tanto to the liquidation of the indebtedness. No one makes any claim that a fair return was not thus obtained from this disposition of the second mortgage security. It is not unlikely that if the matter had not been thus handled the second mortgage security would have shortly been wiped out by the foreclosure of prior liens and Philip E. Winter and his wife would have lost the benefit thereof.

Concerning the contention made on plaintiff's behalf, that the district court committed reversible error in admitting on surrebuttal the testimony of Mr. Cather, the vice-president of the National Bank, relative to the Home Owners' Loan Corporation transaction, we are obliged to say that we cannot see that it did,—the same witness had previously, without objection, quite fully given the details of what had been done in the matter. The admission of objectionable evidence is not ground for reversal where the same, or substantially the same, evidence has been theretofore received without objection, Opitz v. Town of City of Newcastle, 35 Wyo. 358, 249 Pac. 799; Huber v. Thomas, 45 Wyo. 440, 19 Pac. (2d) 1042, and author-

ities cited. So far as the objection that Cather's evidence undertook to contradict by oral testimony the terms of the assignment relative to the transfer of the note is concerned, as already demonstrated, the note was never transferred and the objection is consequently without force.

It is intimated for the plaintiff that there can be no question under the record in this case that the plaintiff is the owner of the United States Gypsum Company stock. His ownership is denied by the answer of the National Bank, and if that matter should be deemed in any way to affect the disposition of this case—of which there is, to say the least, serious doubt—there was, we think sufficient evidence before the trial court to uphold the general finding of that court against the plaintiff and thereby conclude, so far as this court is concerned, that he was not. It is true both Winter and Bradburn testified he was the owner, but there is proof also, to mention some of it briefly, that the stock was originally obtained by Winter from his sister's estate after her death in January, 1931; that in May or April of that year the stock was transferred to him through the reissue by the company of the stock certificate in his name; that Winter told Bradburn prior to such reissue that if certain securities which Winter had previously turned over to Bradburn depreciated in value, this stock should be added to take their place; that between the time the stock was reissued to Winter and August 28, 1931, when the loan of the Trust Company was originally made thereon to him, Winter had never directed the United States Gypsum Company to transfer said stock on its books to Bradburn; that Winter had the physical custody of the certificate when he turned it over to the Trust Company; that the reason the money was borrowed was to enable Bradburn to pay the latter's taxes in the State of Oklahoma; that at the time the money was borrowed Winter never

told the Wyoming Trust Company official who made the loan, that Bradburn owned the stock; that on August 20, 1931, eight days before Winter procured the loan from the Trust Company, Bradburn wrote Winter merely,

"It is compulsory on my part that on the building I get $1,650 plus interest immediately to pay the second half of the taxes. Mr. McKee paid the first half in full. It is up to me to pay the second half. At this time it will be rather hard and costly to borrow or even attempt to borrow the money,"

saying nothing whatever in said letter about the stock or his asserted ownership therein; that the original loan on the stock to Winter was for $1800.00, of which $1650.00 was sent to Bradburn by draft and Winter received the balance in his own personal account; that so far as Winter knew, this stock since its reissue to him after his sister's death always remained in his name on the stock records of the United States Gypsum Company; that Winter did not at any time request that it be transferred to Bradburn because Winter, as he said, had no means of following the value of the bonds turned over to Bradburn or of any demands that may have been made on the latter in that respect; that Bradburn never to Winter's knowledge ever requested that this stock certificate be transferred; and, finally, that on July 11, 1932, nearly a year after the loan was made to Winter and the money sent to Bradburn, Philip E. Winter wrote to Cather, as president of the Trust Company,

"In August, 1931, I made a further loan of $1650.00 to the same party upon the same terms and the same security, together with the additional security of an assignment to me of the debtors undivided 1/64 royalty interest in the production of an oil well in the heart of Oklahoma City which has a capacity yield of 49,000 barrels of oil daily.

"The $1600. I now owe your bank went into this

last-mentioned loan, and you hold in pledge for its security and repayment 100 shares of the common stock of the United States Gypsum Company."

We have been unable to find any error in the record before us which would authorize us to interfere with the judgment of the district court of Natrona County, and it will accordingly be affirmed.

*Affirmed.*

KIMBALL, Ch. J., and BLUME, J., concur.