# BROWN v. SCHLEIER.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH
CIRCUIT.

No. 188.   Argued March 18, 1904.—Decided April 4, 1904.

A national bank erected a building on leased property, the lease securing the
landlord by a lien on the building and the personal obligation of bank.
While a large amount of rent and taxes were unpaid the bank became
insolvent, the property was not paying fixed charges; after notice to,
and no objections by, the stockholders, and no creditors intervening, the
bank conveyed the property with the building back to the landlord in con-
sideration of his releasing the bank and the stockholders from all liabilities
accrued and to accrue under the lease.

*Held* that the proceeding was not *ultra vires*, and that as the judgment of
the stockholders and officers had been prudently exercised in good faith
the landlord acquired title to the land and building and was not liable to
account for the value of the building in an action brought by a creditor
who had knowledge of, and had not protested against, the conveyance
when made.

It is exceedingly disputable whether it is an abuse of discretion justifying
reversal by this court, for the Circuit Court to deny a motion to file an
amended bill after judgment entered.

THIS suit was brought by the predecessor of appellant in the
Circuit Court of the United States for the District of Colorado
to set aside a lease of certain lots in the city of Denver, Colo-
rado, and the subsequent surrender and cancellation of said
lease, as *ultra vires* of the power of the National Bank of
Denver, and for an accounting, and that the amount found due
on the accounting be decreed a prior lien upon the lots and the
building erected thereon by the bank. The case was presented
upon bill and demurrers. The demurrers were sustained and
the bill dismissed. 112 Fed. Rep. 577. The ruling was
affirmed by the Circuit Court of Appeals. 118 Fed. Rep. 981.

The People's National Bank of Denver was incorporated on
the first of August, 1889, as a national bank under the National
Banking Act. Its capital stock was $300,000, and its corporate
existence to be twenty years. In September, 1889, the ap-
pellee Schleier was the owner of lots 1, 2, 3 and 4 in block 75

in the city of Denver, and on that day made a lease thereof to the bank for the period of ninety-nine years from the first day of November, 1890, with an option to extend the term for a further period of fifty years, at an annual rental of $13,975, payable monthly. The bank covenanted to remove at its expense buildings located on the lots within a designated period and to erect thereon a building four stories in height, at a cost of not less than $100,000, which should at once become part of the realty. The bank also covenanted to keep the building and premises in repair and pay all taxes thereon. And it was covenanted that in case of default in the payment of rent, taxes, or performance of other conditions, for the period of fifteen days, Schleier should have the right, after thirty days' notice, to sell and dispose of the lease and all the right and title of the bank thereunder, or to maintain personal actions for the rent or taxes he might have to pay. The heirs, representatives and assigns or successors of the parties were entitled to the benefits of the lease and were bound by its covenants.

The bank erected a building on the lots at an expense of $305,735.30, completing the same January, 1891. The building contained necessary offices for the use of the bank, which were occupied by it until it ceased to do business. The building also contained other offices and rooms which the bank rented to parties not connected with it, and to the People's Savings Bank, a corporation organized under the laws of Colorado.

On July 19, 1893, the bank being unable to pay its depositors, it was placed in the hands of the Comptroller of the Currency, and one J. B. Lazier was appointed receiver thereof, who remained in charge of its affairs until August 21, 1893. On that day the bank agreed to make a voluntary assessment to restore the impairment of its capital, and the receiver was discharged. The directors and officers of the bank then took charge of its business and conducted it until the appointment of the receiver herein.

The bill alleges that the affairs of the bank were very "much involved, mixed and commingled" with those of the People's Savings Bank, and by reason thereof the latter was unable to proceed with its business, and made a general assignment of its assets to Fermor J. Spencer, who has ever since remained in charge and control thereof. As such assignee he sued the People's National Bank and recovered a judgment for the sum of $475,825.71, which has not been paid.

In January, 1897, the bank commenced to take steps looking to a voluntary liquidation and surrender of its charter, and on or about April 27, 1897, the stockholders published a notice of the bank's intention to go into liquidation, and fixed June 27 as the last day on which claims could be presented. Prior to that day Spencer, having commenced suit against the bank for an accounting and adjustment of the matters between the banks, served a summons therein, and also having given notice to the Comptroller of the Currency of the United States of the claims and demands of the savings bank, an agreement was entered into between Spencer and the People's National Bank, whereby he agreed to refrain from taking any further steps in said suit until January 1, 1898, without prejudice by reason of the delay. The bank on its part agreed in consideration of the delay that it would "take no further action of any kind or nature whatsoever to the prejudice of the savings bank," or any action for the surrender of its charter or the disposal of its property, "to the prejudice of the savings bank."

On September 20, 1897, the People's National Bank called and gave notice of a special meeting of its stockholders, for the purpose of considering the proposition to turn over its building to Schleier, the owner of the land, and at the meeting held October 27, 1897, in pursuance of the notice, it was resolved so to do in consideration of a release by Schleier, to the bank and its stockholders from all liability which might thereafter accrue under the terms of the lease. The lease was thereupon cancelled and the premises surrendered to Schleier. This

is alleged by appellant to have been in violation of the statutes of the United States and contrary to the principles of equity governing the distribution and disposition of assets in the payment of dividends on dissolution of insolvent corporations.

It is also alleged, on information and belief, that the notice of the stockholders' meeting stated that the income of the property was less than the fixed charges, and that it was so stated at the stockholders' meeting by the officers of the bank and by Schleier's attorneys and agents, but such was not the case. On the contrary, it is alleged on information and belief, that the income of the property, even in the condition which the neglect of the bank had brought it, was sufficient to pay the rents and all charges due under the lease and keep the building in good order and repair.

The grounds of the demurrers were want of equity and laches. The demurrers were sustained and the bill ordered to be dismissed.

The judgment of dismissal was entered December 30, 1901. On February 1, 1902, appellant tendered an amended bill of complaint and moved for leave to file the same. The motion was denied. This action is assigned as error as well as the ruling on the demurrers.

*Mr. James H. Brown,* with whom *Mr. Harper M. Orahood* was on the brief, for appellant.

*Mr. John M. Waldron,* with whom *Mr. R. D. Thompson, Mr. G. C. Bartels* and *Mr. J. H. Blood* were on the brief, for appellee.

Mr. JUSTICE McKENNA, after stating the case, delivered the opinion of the court.

The bill prayed for a decree declaring the lease between the bank and Schleier and the instruments surrendering and cancelling the same to be declared void and "*ultra vires* of the acts

of Congress of the United States in respect to the powers of national banks to acquire, own and hold real estate or to be or become indebted in the exercise of corporate powers, and that no title or right, legal or equitable, could be acquired under the same or either thereof by the said defendant Schleier to the said bank building and the appurtenances thereunto belonging." An accounting was also prayed, and that the amount found due declared a lien upon the building and lots, and they be sold to satisfy the lien. The Circuit Court of Appeals regarded the bill as charging, not only the initial, but the dominant and determining wrong to be the lease, that being Schleier's participation in the alleged diversion of the bank's funds, constituting him a trustee for creditors. It was, therefore, natural for the court to observe the theory of the bill was that the lease was void, and that Schleier was liable for the damages which the creditors of the bank sustained in consequence of its execution without lawful authority. The court discussed that theory, and decided (1) that the power conferred by section 5137 of the Revised Statutes upon national banks to purchase real estate needed for their accommodation in the transaction of their business included the power of leasing property whereon to erect buildings suitable for their wants; (2) assuming the transaction to have been *ultra vires*, the complainant (appellant) was not by virtue of his office as receiver "authorized to challenge or impeach it."

Appellant now says that the conception of the bill by the Circuit Court of Appeals was incorrect, and "not only limits, but completely reverses the theory of the bill, in a manner totally inconsistent with the admitted allegations." And appellant concedes "that only the government may complain of an executed *ultra vires* conveyance of real estate to a corporation," and rests his case upon "loss of the moneys and assets of the bank—in the form of the bank building—to which Schleier claims title through the conveyance and surrender on October 30, 1897, under the terms of his lease to the bank."

We may take appellant at his word and omit extended discussion of the first proposition, although he has indulged in much argument which confuses his concessions. For instance his counsel say: "While denying the sufficiency of the lease to lawfully bind either the bank or its title to its $305,000 capital assets, we say, very well then! Since in the completed building in the actual possession of the bank, it still had an asset, the then depositors, now judgment creditors of this bank, represented by this appellant receiver, want to know why Schleier, who is not an innocent purchaser for value, without notice, should not be held liable to account for this asset, the building?"

But pronouncing Schleier not an innocent purchaser, denominating the building an asset of the bank, does not change the issues in the case. It is only another way of presenting them. Why should Schleier account for the building? Necessarily either because of the execution of the lease or its surrender. Of its execution we need not make much comment. The lease certainly was not different from any other interest in real estate acquired *ultra vires*—no more vulnerable to attack, no more a diversion of funds. Whether it would be a gain or loss—an antithesis made much of in argument to distinguish between the lease and an absolute conveyance— was a matter of judgment. It seems now to have been a folly for the bank to have put its whole capital in a building. But, may be, that is the confident conclusion which can be formed after experience. The judgment of the bank in making the lease and erecting the building seems not to have been thought by creditors to have been improvident, and the Comptroller of the Currency did not disapprove. The bill alleges that the Comptroller of the Currency, in the year 1893, deemed an assessment of twenty per cent sufficient to redeem the bank from embarrassment and establish it as a solvent concern; and its chief creditor, the People's Savings Bank, whose affairs, the bill avers, had become "commingled and mixed" with those of the bank and thereby associated with its fortunes,

must have had absolute confidence in the value of the building, even though it represented diverted funds. If depreciation came afterwards, it was a misfortune. Under the concession of appellant, therefore, the validity of the lease must be assumed as against him, and the inquiry confined to the validity of the surrender; and that depends upon the condition of the bank at the time it was done. In other words, the lease, with its benefits or burdens, and the condition of the bank at the time of its surrender, must be the test of the action of the bank officers and the rights of creditors.

The bank was insolvent, taxes on the property were unpaid and three months' rent was due. Under the terms of the lease, Schleier could pay the taxes, and for reimbursement and the satisfaction of the rent could sell the lease and all the right, title and interest of the bank therein, or maintain personal actions for such taxes and rent. Schleier, therefore, for what was then due and for his monthly accruing rent, had not only a lien upon the property, but had as well the personal obligation of the bank. Against this liability what had the bank? The bill alleges nothing but the lease, and to that no value is assigned. Its revenue did not exceed its obligations. It is true it is alleged that the building had been allowed to get out of order, and that notwithstanding its condition the rents from it would have paid the charges against it. But the fact establishes nothing definite. What can be inferred from it? Such disproportion between the value received by Schleier and that received by the bank as to shock the conscience, establish fraud, and that the surrender of the lease was an illegal preference? The situation must be kept in mind. The bank was and had been insolvent. It was compelled to go into liquidation; it was in arrears for rent and taxes, and was confronted with ever-recurring liabilities which it might not be able to discharge. Certainly could not discharge unless it remained a going concern, which was not possible. Under such circumstances the settlement with Schleier does not seem to have been even bad judgment. And it was openly done—adver-

tised in advance to all who were interested to prevent, and the reason for it declared to be that the income of the property was less than the fixed charges; in other words, had no value—represented only liabilities. No one intervened. Creditors did not, and this suit was not brought until December, 1900—three years after the surrender of the lease. The conclusion is irresistible that the judgment of the stockholders in surrendering the lease was honestly and prudently exercised. This is fortified by the prayer of the bill. Appellant does not ask to have the surrender of the lease set aside and the bank restored to its relations and obligations to Schleier. He asks that the bank be relieved from all obligations and the cost of the building imposed as a charge upon the real estate.

It is unnecessary to discuss the ruling of the Circuit Court on the motion to file an amended bill. The bill tendered was fuller and more explicit than either the original bill or the amendments thereto, but it alleged nothing which would affect the legal conclusions from the facts to which we have adverted. And we may observe that it is exceedingly disputable whether it is an abuse of discretion to deny a motion to file an amended bill after final judgment has been entered.

*Decree affirmed.*