Irving **BRODSKY**, Plaintiff,

v.

The **PERTH AMBOY NATIONAL BANK**, Defendant.

Civ. A. No. 391–56.

United States District Court
D. New Jersey.

Nov. 8, 1957.

Gross, Blumberg, Goldberger & Stavis, Newark, N. J., by Morton Stavis, Newark, N. J., for plaintiff.

Wilentz, Goldman, Spitzer & Sills, Perth Amboy, N. J., by Arthur J. Sills, Perth Amboy, N. J., for defendant.

WORTENDYKE, District Judge.

In his complaint, filed in this action on May 14, 1956, plaintiff, a New York resident, and owner of certain shares of the capital stock of the defendant national bank, having its principal office in New Jersey, prayed that this Court adjudicate the invalidity of proceedings of the annual meeting of defendant's stockholders, held on January 10, 1956, and the election of directors thereat, and that this Court order a new election of directors and direct that the plaintiff be permitted to vote his shares of stock at such new election. The defendant duly answered the complaint and incorporated in its answer a counterclaim against plaintiff and others not parties to the suit.

It was thereafter reported to the Court by counsel for the parties that the cause or causes of action, if any, alleged in the complaint had been relinquished and withdrawn. The case, therefore, proceeded to trial upon the counterclaim and plaintiff's answer thereto. ·

For convenience in reference, the defendant-counterclaimant will be hereinafter referred to as the Bank and the plaintiff as Brodsky. Brodsky is one of four tenants-in-common of the fee of the real estate[1] who acquired title thereto by mesne conveyances from the Bank's lessor, for value, and in reliance upon the representation, by their immediate predecessor in title, as well as by the Bank itself, that the lease here in question was a valid and subsisting estate in the premises. The Bank has been paying rent regularly in accordance with the terms of the lease, but now seeks to be relieved of its obligations thereunder from the date upon which its counterclaim was filed.

The counterclaim with which we are here concerned embodied five counts, the first three of which have been dismissed upon Brodsky's motion. This opinion embodies the Court's decision upon Brodsky's motion to dismiss the fourth and fifth counts of the counterclaim, which was made and argued at the close of the evidence for the Bank, and decision thereon then reserved to permit the parties to file briefs.

The critical question presented for determination is whether the Bank may disaffirm, as of June 18, 1956 (the date upon which its answer and counterclaim were filed), the lease made by the Bank on July 15, 1954, of a certain office building in which the Bank maintains its business office.

The evidence before the Court when the Bank rested its case may be generally summarized as follows:

In the year 1938 the Bank acquired title to the building and its curtilage for the sum of $500,000 by deed of conveyance from Frank Van Syckle and wife, dated February 16, 1938.

The Bank had theretofore, and has continuously ever since, occupied the ground floor and its mezzanine for its banking offices, together with the basement for vault space, and rented the remaining floors of the ten story building to various corporate tenants. The reasonable rental value of the portion of the building occupied by the Bank for its banking business was estimated at $18,000 per annum, as of July 2, 1954.

As of December 31, 1953, the entire building and land was carried on the books of the Bank at $429,349.58. As of the same date, the Bank's financial statement to the Comptroller of the Currency showed a capital surplus of $500,000 and undivided profits of $838,103.84.

From 1930 to January 1954, the President of the Bank owned or controlled 90% of its issued and outstanding stock, which he sold, in that month, to Post Publishing Company. He continued in his capacity as President, and as a member of the Board of Directors until July of that year. His resignation, together with those of certain other members of the Board of Directors of the Bank, followed his disapproval of a proposal submitted by the new controlling stockholder, that the Bank sell its land and building for a price of $800,000 and take back a lease of the entire premises at an annual net rental of $80,000, the lessee paying all maintenance and operating charges against the demised premises. The transaction was accordingly duly authorized by vote of the new Board of Directors. The former President's disapproval of the transaction was based upon his belief that the rent obligation, as well as the purchase price, was excessive because of the large proportion of vacancies in the building, and also because the limited portion of the building occupied by the Bank for its banking purposes did not, in his opinion, justify its assumption of maintenance and operating charges for the entire building

1. N.J.S.A. 46:3–17; Mandebaum v. Weiss, App.Div., 1950, 11 N.J.Super. 27, 77 A.2d 493.

in addition to the amount of net rent which it became obligated to pay under the lease.

After the transaction had been consummated and the parties thereto had performed under the terms of the lease for several months, Brodsky entered into a contract, dated December 29, 1954, to purchase the real estate, subject to the lease, and that contract was consummated in a conveyance to Brodsky and his three associates as tenants-in-common.

■ There is no evidence tending to show (a) that the Comptroller of the Currency was advised of the criticized transaction or (b) that he either approved or disapproved thereof. The evidence is also barren of any basis for finding that Brodsky, or any of his co-tenants, had anything to do with the suggestion or consummation of the sale and lease-back transaction. I am unable to find any ground or theory upon or under which invalidity of the leasehold can properly be asserted against Brodsky or his co-tenants by the Bank in this action. Indeed, plaintiff's co-tenants, as well as the holder of the mortgage which was placed upon the real estate after the lease was executed, would be indispensable parties respondent to the relief sought by the Bank in this case. Federal Rules of Civil Procedure, Rule 19(a), 28 U.S. C.; Niles-Bement-Pond Co. v. Iron Moulders' Union, Local No. 68, 1920, 254 U.S. 77, 41 S.Ct. 39, 65 L.Ed. 145; Metropolis Theater Co. v. Barkhausen, 7 Cir., 1948, 170 F.2d 481; Calcote v. Texas Pac. Coal & Oil Co., 5 Cir., 1946, 157 F.2d 216. The absence of such indispensable parties compels dismissal of the entire counterclaim. Martucci v. Mayer, 3 Cir., 1954, 210 F.2d 259.

The motion addressed to the fourth and fifth counts of the counterclaim, however, should also prevail upon the merits.

The fourth count of the counterclaim, after alleging the "sale and lease-back" transaction, and tracing the title to the real estate into Brodsky and his tenants-in-common, charges that the fair market value of the Bank's leasehold interest would not exceed $50,000 per annum, and that the fair market value of the portion of the building occupied and used by the Bank for its banking business does not exceed $24,000 per annum. It alleges that the net rental which has been paid by the Bank to the landlord is $55,000 per annum after deducting from the $80,000 per annum amount of rent reserved the receipts from other tenants in the building, less the cost of maintenance and operation assumed by the Bank under the lease. Upon these figures the Bank contends that it has suffered annual damage in the approximate amount of $35,000. Charging that the lease agreement was illegal, the Bank prays that this Court declare the agreement null, void and of no effect and that the Bank be awarded damages in the amount of $35,000 against Brodsky and his co-tenants.

The fifth count charges that the Bank's entry into the lease was ultra vires, and seeks similar adjudicative relief and damages.

In contending for the invalidity of the lease and as a basis for its assertion that the Bank's entry into the lease was ultra vires, reliance is placed upon the construction of 12 U.S.C.A. § 29 [2] by the Ninth Circuit Court of Appeals in Houston v. Drake, 1938, 97 F.2d 863.

Brodsky argues, however, that if the Bank's entry into the lease exceeded the authority delegated by Section 29, only the Comptroller of the Currency may question the propriety of the transaction and relies upon the construction accorded to the statutory section in Brown v. Schleier, 9 Cir., 1902, 118 F. 981, affirmed, 1904, 194 U.S. 18, 24 S.Ct. 558,

2. 12 U.S.C.A. § 29.
    "A national banking association may purchase, hold, and convey real estate for the following purposes, and for no others:

"First. Such as shall be necessary for its accommodation in the transaction of its business."

48 L.Ed. 857, and subsequent interpretive decisions.

The Bank may not here question the validity of the lease. It has estopped itself by its solemn execution and recognition of the instrument in which the lease agreement is embodied. The Bank, "having assumed by entering into the contract (of lease) * * * to have the requisite power, both parties (to the contract) are estopped to deny it." Whitney v. Wyman, 1879, 101 U.S. 392, 397, 25 L.Ed. 1050. The Bank has reaffirmed the validity of the lease in its letter of April 1, 1955. If the Bank is estopped, as to the lessor, the efficacy of the estoppel to protect lessor's grantees (including plaintiff and his co-tenants), who purchased the fee of the reversion for value and in reliance upon the existence and validity of the lease, becomes the more conclusive. That the former president and some of its directors did not consider the sale-and-lease-back transaction advantageous to the Bank will not, in the absence of fraud or mistake, justify a rescission, cancellation or termination of the lease, nor a recovery by the Bank of rent money paid thereunder. If the Bank's entry into the transaction was ultra vires under 12 U.S.C.A. § 29, the Bank may not relieve itself of its commitment thereunder. Only the sovereign may be heard to object thereto. Kerfoot v. Farmers' & Merchants' Bank, 1910, 218 U.S. 281, 286, 31 S.Ct. 14, 54 L.Ed. 1042; National Bank v. Whitney, 1880, 103 U.S. 99, 103, 26 L.Ed. 443; Union National Bank v. Matthews, 1878, 98 U.S. 621, 25 L.Ed. 188. In Kerfoot the action was brought by the administrator and sole heir of the deceased grantor in a deed to a national bank, to set aside the conveyance "upon the ground that under * * * [the] statutes of the United States * * *, relating to national banks, the bank was without power to take the property." In reaching its conclusion that the deed was effective to pass title to the bank, the Supreme Court (218 U.S. at page 286, 31 S.Ct. at page 14) used the following language:

"But while the purpose of this transaction was not one of those described in the statute for which a national bank may purchase and hold real estate, it does not follow that the deed was a nullity, and that it failed to convey title to the property.

"In the absence of a clear expression of legislative intention to the contrary, a conveyance of real estate to a corporation for a purpose not authorized by its charter is not void, but voidable, and the sovereign alone can object. Neither the grantor nor his heirs nor third persons can impugn it upon the ground that the grantee has exceeded its powers."

Recognition of the foregoing principle is disclosed in Noel Estate v. Commercial National Bank in Shreveport, 5 Cir., 1956, 232 F.2d 483 and in Langham's Estate v. American National Bank of Beaumont, Texas, 5 Cir., 1948, 165 F.2d 968. That principle governs the case at bar. Vid et., Brown v. Schleier, supra. Houston v. Drake, supra, relied on by the Bank does not reject the foregoing principle. It is factually distinguishable from the present case. It held that the liquidator of an insolvent national bank might disaffirm the unexecuted portion of a 99-year lease on property *not occupied by the bank*. The lease in that case covered premises occupied by a bank other than that represented by plaintiff as liquidator. The original lessee bank transferred its assets, less the lease, to plaintiff's bank, and the latter assumed all the obligations and liabilities of the former. Lessee bank gave its assignee an option to take over the lease. This option was exercised by an agreement of assignment to which the owner of the premises, the original lessee and plaintiff's (assignee) bank were parties. By the terms of this agreement the landlord reduced the rent reserved by the lease and plaintiff's bank agreed to assume the lease obligations as so modified. The assignor bank relied on Brown v. Schleier, supra, to support the valid-

ity of the lease assignment and of the assignee's assumption of liability thereunder, but the court refused to accept the Brown case as a precedent because (as stated in the opinion, 97 F.2d at page 865) "the difficulty with these propositions is that there is no showing that the (assignee) Bank intended to use this property for the transaction of its business. On the contrary, the evidence shows that the (assignee) Bank owned the premises in which it was conducting its business and occupied them except for a period of nine months when it moved *temporarily* (emphasis supplied) to the leased premises in order to permit the construction of a new building on its property." The same circuit court distinguished the Houston case in Frank v. Giesy, 9 Cir., 1941, 117 F.2d 122, in sustaining the validity of a lease under which a national bank assumed liability upon consolidation with the original lessee bank. The Court in the Frank case said (at page 125) that "the lease did not become ultra vires simply because the lessee, upon its consolidation with another bank, no longer occupied the leased premises" (citing Brown v. Schleier, supra). As against Brodsky, in any event, the Bank has estopped itself to impugn the validity of the lease, and only the Comptroller of the Currency may assert that it was ultra vires the Bank.

■ The Bank also contends in this case that the Bank's entry into the lease was ultra vires under 12 U.S.C.A. § 371d[3], because the leasehold constitutes an investment in bank premises aggregating in excess of the capital stock ($500,000) of the Bank. The Bank argues that the limitation prescribed in the quoted section has been exceeded because (in the language of its brief) "the liabilities incurred under the lease were $80,000 times 21 years, plus all of the other carrying charges for each year." In the year 1954 alone these charges were stated to be $56,000. Brown v. Schleier, supra, holds adversely to this contention. The Court of Appeals in Brown said (118 F. at page 985):

"We are furthermore of the opinion that the lease in controversy was not invalid because the gross rents payable during the term would have amounted to a sum exceeding $300,000, which was the amount of the bank's original capital. The gross rents that were to accrue and would have accrued at intervals during the 99-year term, if the lease had not been surrendered or cancelled, do not, in our judgment, constitute an indebtedness, within the fair intent and meaning of (the limiting statute)."

For the same reason Section 82 of Title 12 of the United States Code Annotated does not afford the Bank an effective defense against its continuing liability under the lease.

■ Further, as already indicated with respect to 12 U.S.C.A. § 29, the statement that only the sovereign may be heard to object to a transaction apparently in conflict with statutory regulations where a bank seeks to exercise its powers, is equally applicable to these two sections, it being the exclusive function of the Comptroller of the Currency to enforce such regulations. Inland Waterways Corp. v. Young, 1940, 309 U.S. 517, 524, 60 S.Ct. 646, 84 L.Ed. 901; Cooper v. O'Connor, 1938, 69 App. D.C. 100, 99 F.2d 135, 118 A.L.R. 1440.

Judgment will be entered in favor of the plaintiff, Irving Brodsky, dismissing the counterclaim of defendant, The Perth Amboy National Bank. Submit order.

---

3. 12 U.S.C.A. § 371d.
  "No national bank, without the approval of the Comptroller of the Currency, * * * shall (1) invest in bank premises, * * * if the aggregate of all such investments and loans, together with the amount of any indebtedness incurred by any such corporation which is an affiliate of the bank, as defined in section 221a of this title, will exceed the amount of the capital stock of such bank."