365 F.2d 641
 W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Appellant,
v.
FIRST NATIONAL BANK AND TRUST COMPANY, a corporation; and First National Building Management Corporation, Appellees.
 No. 8364.
 United States Court of Appeals Tenth Circuit.
 August 30, 1966.
 
 Charles Donahue, Sol. of Labor (Bessie Margolin, Assoc. Sol., Sylvia S. Ellison and Anastasia T. Dunau, Attys., Dept. of Labor, and Major J. Parmenter, Regional Atty., Dept. of Labor, were with him on the brief), for appellant.
 R. C. Jopling, Jr., Oklahoma City, Okl. (Fred A. Gipson and Fowler, Rucks, Baker, Jopling, Gramlich & Mee, Oklahoma City, Okl., were with him on the brief), for appellees.
 Before BREITENSTEIN, HILL and SETH, Circuit Judges.
 BREITENSTEIN, Circuit Judge.
 
 
 1
 The question is whether 1961 amendments to the Fair Labor Standards Act[1] bring within the coverage of the Act the operation and maintenance employees of a building complex owned by a national bank and operated by a separate corporation wholly owned by the bank. The Secretary sued to restrain violations of the minimum wage,[2] overtime[3] and record keeping[4] provisions of the Act. The case was submitted on stipulated facts. The district court denied the requested injunction[5] and the Secretary has appealed.
 
 
 2
 Appellee-defendant First National Bank and Trust Company (Bank) owns a complex of three interconnected buildings in Oklahoma City and occupies 20.7% of the gross usable space. The remainder is rented to a variety of tenants, some of whom are engaged in interstate commerce. The entire complex is operated as a unit by appellee-defendant First National Building Management Corporation (Management) which is wholly owned by Bank, which is staffed in part by Bank personnel, and which uses Bank equipment for bookkeeping and accounting purposes. Management accounts to Bank for the net rental income which amounts to over $2,000,000 annually. Bank pays Management $2,500 monthly as a "management fee" for its services. Management has never paid a dividend and has accumulated over $100,000.
 
 
 3
 Bank has an average of 440 employees all of whom are admittedly subject to the Act. Management employs an additional 205 persons. Of these 15 engineers, 6 electricians, 4 carpenters, and 10 painters do work "in connection with the operation of the entire area of the three buildings, including those portions occupied exclusively by the defendant Bank." Management has 115 porters, maids, or other cleaning personnel "who clean the hallways, offices and restrooms in said buildings, including those portions of the premises occupied by the Bank." Cleaning personnel are "rotated each two nights and on reassignment may be assigned to any part of the premises, including those occupied by the Bank."
 
 
 4
 Bank and Management rely on 10 East 40th St. Bldg., Inc. v. Callus, 325 U.S. 578, 65 S.Ct. 1227, 89 L.Ed. 1806, to support their claim that the employees of Management are not covered. That decision is not controlling because it was decided before the 1961 amendments and the Secretary makes no claim of coverage before those amendments were enacted. Our problem is the effect of the amendments on the operations here under consideration.[6]
 
 
 5
 The purpose of the 1961 amendments was "to strengthen and extend the scope" of the Act.[7] Coverage is enlarged to "enterprises" engaged in commerce or in the production of goods for commerce.[8] An enterprise exists when there are (1) related activities (2) performed through unified operation or common control (3) for a common business purpose.[9]
 
 
 6
 The term "related activities" is not defined. Senate Report No. 145 says that activities are related "when they are auxiliary and service activities such as central office and warehousing activities and bookkeeping, auditing, purchasing, advertising, and other services."[10] For the bank to engage in the banking business it must have a base for its operations and that base must be maintained and serviced. Management provides such maintenance and service and it does so by the indiscriminate use of its employees who work both in the parts of the complex occupied by the Bank and in the parts occupied by the tenants. Such auxiliary and service activities are sufficiently connected with the banking business to satisfy the "related activities" requirement.
 
 
 7
 Little need be said about common control. The Bank owns Management and has its officers on the board of directors of Management. The chief executive of Management is a vice-president of Bank who receives a salary of $15,000 a year from Bank and $1,200 a year from Management. Bank controls Management both in theory and in practice.
 
 
 8
 The third test is "common business purpose." That phrase is not defined. The Senate Report says that "[e]leemosynary, religious, or educational and similar activities of organizations which are not operated for profit * * are not activities performed for a common business purpose."[11] This statement that a common business purpose does not occur when a nonprofit activity is combined with a profit activity does not mean that two otherwise unconnected activities are for a common business purpose solely because each is conducted for profit.
 
 
 9
 Although the profit motive, standing alone, does not suffice to satisfy the common-business-purpose requirement, the facts of this case are sufficient to bring Bank and Management within the statutory language. National banks are precluded by law from engaging in activities which are not related to their banking business.[12] A recognized incident to such business is the right of a bank to own its office building and to spread its expenses and operating costs by renting space to tenants.[13] The building is a base for the activities of Bank. It is an investment and asset of Bank. The performance by Management of maintenance and service work is necessary and essential to the conduct of the banking business. Management operates the complex as a unit. In sum, the activities of Management are necessary, essential, and common to the business of Bank. The fact that both are interested in making a profit is only incidental.
 
 
 10
 Bank and Management are an "enterprise" within the § 203(r) definition. The Act covers employees of "an establishment described in section 203(s) (3) * * * of this title."[14] Section 203(s) (3) defines the phrase "Enterprise engaged in commerce or in the production of goods for commerce" to include:
 
 
 11
 "any establishment of any such enterprise * * * which has employees engaged in commerce or in the production of goods for commerce if the annual gross volume of sales of such enterprise is not less than $1,000,000."
 
 
 12
 The statute does not define "establishment." We believe that such term is not restricted to separate or independent locations but encompasses one or more corporate or other organizational units.[15] Here we have an enterprise composed of two units.
 
 
 13
 This brings us to the requirement that "the annual gross volume of sales of such enterprise is not less than $1,000,000." Bank has annual gross earnings of over $15,000,000; and its employees are concededly engaged in the production of goods for commerce.[16]
 
 
 14
 The other unit, Management, has gross earnings of over $2,000,000 annually from rentals. It argues that such earnings do not bring it within § 203(s) (3) because rentals are not sales. Section 203(k) defines "sale" to include "any sale, exchange, contract to sell, * * * or other disposition." This definition does not limit the term "sale" to transactions in commodities. Management markets the property under its control by renting or leasing space to tenants. This is a "disposition" within the statutory definition, and, we believe, conforms with the congressional intent to set a standard of size of those businesses which would be covered by the 1961 amendments.[17] The Fifth Circuit reached the same conclusion in Wirtz v. Savannah Bank & Trust Co., 5 Cir., 362 F.2d 857.
 
 
 15
 We have here a two-unit enterprise. The employees of one unit, Bank, are engaged in the production of goods for commerce. The other unit, Management, meets the monetary requirement of § 203(s) (3). The inclusion of employees of each unit within Act coverage promotes harmony by providing access to the same statutory benefits and accords with the congressional declaration of policy found in 29 U.S.C. § 202. Indeed, the Senate Report recognizes that the purpose of the provision which became § 203 (s) (3) is to "eliminate fragmentation of coverage" and to extend "uniformity" of coverage.[18] In our opinion the employees of Management are covered by the Act.
 
 
 16
 The judgment is reversed with directions to grant the injunctive relief sought by the Secretary.
 
 
 
 Notes:
 
 
 [1]
 29 U.S.C. § 201 et seq
 
 
 [2]
 29 U.S.C. § 206(b)
 
 
 [3]
 29 U.S.C. § 207(a) (2)
 
 
 [4]
 29 U.S.C. § 211(c)
 
 
 [5]
 Wirtz v. First National Bank and Trust Co., W.D.Okl., 239 F.Supp. 613
 
 
 [6]
 Other litigation concerns the same general problem. In Wirtz v. Savannah Bank & Trust Co. of Savannah, S.D.Ga., D.C., 247 F.Supp. 547, the district court held that maintenance and cleaning employees of a bank office building "whose duties are limited to those portions of the building leased to tenants" were not covered. The Court of Appeals for the Fifth Circuit reversed, 362 F.2d 857, opinion filed June 27, 1966. In Wirtz v. Columbian Mutual Life Ins. Co., W.D.Tenn., 246 F.Supp. 198, the district court held that the Act covered service and custodial employees of an office building owned by the insurance company and occupied by it as its home office and tenants. The case is now on appeal in the Sixth Circuit
 
 
 [7]
 S.Rep. No. 145, 2 U.S. Cong. and Adm. News '61, p. 1620
 
 
 [8]
 Id. at p. 1659
 
 
 [9]
 29 U.S.C. § 203(r)
 
 
 [10]
 2 U.S. Cong. and Adm.News '61, p. 1660
 
 
 [11]
 Ibid
 
 
 [12]
 See 12 U.S.C. §§ 21, 24, and 29
 
 
 [13]
 See Brown v. Schleier, 8 Cir., 118 F. 981, 984, affirmed 194 U.S. 18, 24 S.Ct. 558, 48 L.Ed. 857
 
 
 [14]
 Section 206(b) relating to minimum wage. See also § 207(a) (2) relating to maximum hours, and § 211(c) relating to record keeping
 
 
 [15]
 See § 203(r) which defines "enterprise" to include activities "whether performed in one or more establishments or by one or more corporate or other organizational units."
 
 
 [16]
 Following the broad construction of the phrase "production of goods for interstate commerce" in Western Union Tel. Co. v. Lenroot, 323 U.S. 490, 503, 504, 65 S. Ct. 335, 342, 89 L.Ed. 414, two circuits have held that the banking business is within that term. See Bozant v. Bank of New York, 2 Cir., 156 F.2d 787, and Union Nat. Bank of Little Rock, Ark. v. Durkin, 8 Cir., 207 F.2d 848
 
 
 [17]
 See Wirtz v. Columbian Mutual Life Ins. Co., D.C., 246 F.Supp. 198, 203. The Senate Report says: "The million dollar test is an economic test. It is the line which the Congress must draw in determining who shall and who shall not be covered by a minimum wage. It is a way of saying that anyone who is operating a business of that size in commerce can afford to pay his employees the minimum wage under this law." See 2 U.S. Cong. and Adm.News '61 at p. 1624. Our conclusion is fortified by the discussion of "Measuring the annual dollar volume of sales" in the Senate Report. Id. at pp. 1657-1658
 
 
 [18]
 The Senate Report says that the purpose of the provision which became § 203(s) (3) "is to eliminate fragmentation of coverage in the establishments of these large enterprises and prevent continuance of a situation in which some of the employees in such an establishment have the protection of the act while others who work side by side with them do not. This provision would extend, to employees and employers in large enterprises where present coverage provisions apply, the same uniformity of coverage that is provided by the bill for large enterprises in which the employees are excluded from present coverage." 2 U.S. Cong. and Adm.News '61, at p. 1650