James D. HODGSON, Secretary of Labor, United States Department of Labor, Appellant in No. 18,772,

v.

ARNHEIM AND NEELY, INC., a Corporation, Appellant in No. 18,773.

Appeal of the INSTITUTE OF REAL ESTATE MANAGEMENT OF the NATIONAL ASSOCIATION OF REAL ESTATE BOARDS, Intervenor, No. 18,774.

Nos. 18772–18774.

United States Court of Appeals, Third Circuit.

Argued March 17, 1971.

Decided June 15, 1971.

Carin Ann Clauss, U. S. Dept. of Labor, Washington, D. C. (Laurence H. Silberman, Sol. of Labor, Bessie Margolin, Assoc. Sol., Sylvia S. Ellison, Atty., U. S. Dept. of Labor, Louis Weiner, Regional Sol., Washington, D. C., on the brief), for James D. Hodgson, Sec. of Labor.

Eugene B. Strassburger, Jr., Strassburger & McKenna, Pittsburgh, Pa., for Arnheim and Neely, Inc.

Frank L. Seamans, Eckert, Seamans & Cherin, Pittsburgh, Pa. (Robert P. Lawry, Pittsburgh, Pa., on the brief), for intervenor.

Before ADAMS and GIBBONS, Circuit Judges, and WHIPPLE,* District Judge.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

In this case, we are asked to decide whether a real estate management company which operates and maintains, but does not own, certain commercial buildings is an employer whose activities are regulated by the Fair Labor Standards Act as amended.

The Secretary of Labor sought an injunction in the District Court for the Western District of Pennsylvania under § 17 of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., to enjoin Arnheim and Neely, Inc. (Company) from violating the minimum wage, overtime, and record keeping provisions of the Act, and to require the Company to pay back wages owed to the employees.

The District Court decided that from January, 1964 until February, 1967 the Company had not been subject to the Act's requirements, but thereafter, as a result of the 1966 amendments to the Act, the Company came within the enlarged scope of the Act, because the 1966 amendments reduced the economic criteria for coverage. Accordingly, the District Court granted the relief sought by the Secretary of Labor for the years following 1967 only. The Government appealed, and the Company filed a cross appeal.

The facts have been stipulated. The Company manages eight office buildings and one apartment house located in the greater Pittsburgh area. The Company does not own these buildings except for a minor interest in one of them, but operates them under a management contract. Pursuant to the contract, the Company obtains tenants, negotiates and signs leases, institutes legal actions regarding these leases when necessary, alters and redecorates the buildings according to its own judgment, obtains utility contracts, and pays taxes and other bills relating to the properties. The Company collects the rent receipts for each building and deposits them in a separate bank account established for each building. The funds deposited in these accounts are the property of each building's owner, and expenses for each building are paid from the bank account established for that building. Any loss suffered in regard to a particular building is the loss of the owner of such building and not of the Company. Likewise, the profits belong to the respective owners of the buildings and not to the Company. Periodically, the Company withdraws the balance of funds having accrued in each account and forwards them to the respective owners.

The Company hires, discharges and supervises all employees necessary for the operation and maintenance of the buildings. Such employees include building superintendents and their assistants, cleaning ladies, custodians, watchmen, and elevator operators. Subject to the approval of the building's owner, the Company assigns each worker to his particular duties, fixes hours of work, and negotiates rates of pay and fringe benefits. In each building at least two employees operate elevators which carry postmen and messengers who deliver mail and packages to the building's tenants; a portion of such mail and packages originate from points outside of Pennsylvania. In one of the buildings, the Buhl Building, two employees personally deliver to tenants parcels, some of which originate outside of Pennsylvania. At another building, 319 Fifth Avenue, the elevator operators transport freight from the tenants, a portion to be delivered to points outside of Pennsylvania.

* Of the New Jersey District Court sitting by designation.

"Staff managers" employed by the Company maintain records relating to these buildings and submit periodic reports to the owners ·of each building. Some of the owners are located in states other than Pennsylvania. In 1964, the aggregate gross receipts from the nine buildings was approximately two million dollars, and from 1956 until the present the gross receipts have exceeded one million dollars per year.[1] The Company's commissions have varied from year to year, but at no time have they exceeded five hundred thousand dollars in any one year.

The Fair Labor Standards Act requires employers covered by the Act to pay their employees a fixed minimum wage,[2] forbids employers to require their employees to work more than a forty hour week unless they receive one and one half times their regular wages for such work, and mandates that records of wages and hours be maintained by the employers.

In reaching its ultimate conclusions regarding the scope of the Act's coverage before and after the 1966 amendments, the District Court made several subsidiary legal determinations. Each has been attacked, either by the Secretary or the Company.

## I

The District Court decided that the Company, notwithstanding the fact that it was acting as an *agent* in hiring employees to maintain the buildings, was an "employer" as defined by the Act. In so deciding the District Court rejected the Company's contention that the term "employer" was to be given its common law or its traditional meaning. Instead, the Court applied the standard contained within the Act itself. The Act provides "that the term 'employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee * * *" 29 U.S.C.A. § 203(d). On its face the statute adopts a definition of the term "employer" broader than that of the common law, and applicable under the present facts to the Company. Thus, in Greenberg v. Arsenal Bldg. Corp., 50 F.Supp. 700 (S.D.N.Y.1943), aff'd 144 F.2d 292 (2nd Cir. 1944), rev'd on other grounds *sub nom.* Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 (1945), it was held that a real estate management company is an employer for purposes of the Act despite the agency relationship of the management company to owners of the managed buildings.

The fact that the owners of the buildings may also be considered "employers" as a result of their ultimate right to review policies and hiring practices followed by the Company does not preclude a finding that the Company is also an "employer." The Act contemplates the

---

1. The gross receipts of each building during 1964 are stipulated:

| | |
|---|---|
| Buhl Building | $ 93,537.62 |
| Clark Building | 800,902.10 |
| Eureka Savings Building | 71,873.24 |
| Keenan Building | 176,653.72 |
| Martin Building | 117,948.45 |
| Pittsburgh Terminal Properties | 285,225.57 |
| University Square No. 1 | 277,848.02 |
| Pittsburgh Life Building | 54,307.00 |
| Building 319 Fifth Avenue | 57,190.00 |
| | $1,935,485.72 |

---

2. The basic minimum wage set by the Act has been increased by Congress several times during the periods relevant to this case:

| | |
|---|---|
| From 1/4/64 until 1/31/67 | $1.25 |
| From 2/1/67 until 1/31/68 | $1.40 |
| From 2/1/68 until the present | $1.60 |

possibility of several simultaneous "employers", any one of which may be liable as an employer under the Act. Wirtz v. Hebert, 368 F.2d 139 (5th Cir. 1966); Mid-Continent Pipe Line Co. v. Hargrave, 129 F.2d 655 (10th Cir. 1942).

The Company argues that Bartels v. Birmingham, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947), provides the applicable test—one of economic reality—to determine whether it is an "employer." As support for this contention, the Company stresses certain language of the *Bartels* opinion: "Obviously control is characteristically associated with the employer-employee relationship but in the application of social legislation employees are those who as a matter of economic reality are dependent upon the business to which they render service." 332 U.S. at 130, 67 S.Ct. at 1550. The District Court read this language in conjunction with United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947), decided a week before *Bartels*, which held that in social legislation the term "employer" was not to be given a restrictive common law construction. 331 U.S. at 712, 67 S.Ct. 1463. Thus the courts are required to avoid technical concepts of the employment relationship and are admonished to examine the economic realities presented by the facts of each case. Goldberg v. Whitaker House Coop., 366 U.S. 28, 33, 81 S.Ct. 933, 6 L. Ed.2d 100 (1961). Applying the "economic reality" test to the present facts, there can be no doubt of the appropriateness of treating the Company as an employer. The Company's business is that of maintaining and managing real property for the individual owners of such property. Such activity provides economic benefit to the Company's clients as well as to the Company itself. Unsatisfactory work will harm both the Company and the building owners. Since the Company hires these employees and provides the conditions of their employment, it appears that the Company is "acting directly or indirectly in the interest of an employer in relation to an employee." The District Court correctly decided that the Company was an "employer" of the various persons working at the buildings, as such term is defined by the Act.

## II

■ A second test imposed by the Act concerns the amount of "gross volume of sales of [the] enterprise." 29 U.S.C.A. § 203(s) (3) before the 1966 Amendments; 29 U.S.C.A. § 203(s) (1) after the 1966 Amendments. The District Court, over the objections of the Company, decided that the economic test contained in the Act applied to the gross rental receipts of the buildings and not to the gross commissions earned by the Company. We agree with the District Court. The statute clearly refers to the gross sales of an "enterprise,"[3] which term is defined as "related activities performed * * * by any person or persons for a common business purpose. * * *" § 203(r). Thus, in Wirtz v. Jernigan, 405 F.2d 155 (5th Cir. 1968), it was squarely held that in deciding whether the seller of bus tickets came within the Act's coverage, the gross dollar volume of ticket sales, *not* the seller's commission, was the appropriate indicia of coverage. Since rentals are sales within the meaning of the Act, Wirtz v. First National Bank and Trust Company, 365 F.2d 641 (10th Cir. 1966), it logically follows that the gross rentals of buildings managed by the Company, and not merely the Company's commissions are to be considered in applying the Act.

## III

■ Although the Company is an "employer" within the meaning of the Act, and the gross rentals rather than the gross commissions govern, we think the District Court erred when it aggre-

---

3. Before the 1966 Amendments the Act referred to gross sales of any "establishment" of an "enterprise." Thus, prior to the effective dates of the 1966 amendments, it is clear that the gross rentals of each building would have to be considered separately in applying the Act's economic test.

gated the rental income of all nine buildings in applying one of the Act's criteria for coverage, the economic test. In addition to the "employer" requirement of the Act, before the 1966 amendments section 203(s) (3) set forth an economic test which limits the Act's coverage to certain businesses having an annual gross volume of sales in excess of one million dollars. The 1966 amendments expanded the Act's coverage by lowering the economic requirement to $500,000 during the period February 1, 1967 through January 31, 1969, and thereafter to $250,000. The legislative history of the Act makes it abundantly clear that the purpose of providing coverage to those companies with a minimum amount of gross sales was to avoid economic dislocation. The Senate Report accompanying the 1961 Amendments to the Act specifies:

> The million dollar test is an economic test. It is the line which the Congress must draw in determining who shall and who shall not be covered by a minimum wage. It is a way of saying that anyone who is operating a business of that size in commerce can afford to pay his employees the minimum wage under the law. (emphasis added) 1961 U.S.Code Cong. & Admin.News, pp. 1620, 1624.

Since the economic criteria of the Act is based upon a legislative judgment that only businesses which have attained a substantial gross volume of sales should be covered because of their presumed economic capacity to pay a prescribed minimum wage, apparently Congress feared that there might be undesirable economic consequences to small or inefficient businesses if they were brought within the scope of the Act.

The Company here did not benefit, except as to its commission, as a result of the aggregate gross volume of rentals accruing from all nine buildings. Instead it acted solely in an agency capacity on behalf of each of nine separate and distinct businesses. The facts stipulated in this regard are that the rentals collected by the Company are deposited *in separate bank accounts for each owner,* and such funds are the property of the respective owners of the buildings. Any economic loss suffered in connection with a particular building is that of the owner. Similarly any profit enjoyed belongs to the individual building's owner. While as an agent the Company is liable as an "employer" to adhere to the strictures of the Act, nevertheless such vicarious responsibility does not require that the gross rentals of each of the Company's principals be pooled together merely because each principal has employed the Company as an agent.

The District Court reasoned that since the Company "is in the 'business' of managing the buildings' janitorial services, * * * each building becomes one of [the Company's] 'places of business.' " The analysis employed by the court below has been directly adopted by the Fourth Circuit in Shultz v. Falk, 439 F.2d 340 (filed March 3, 1971). However, the Act requires that before separate establishments be deemed part of an enterprise, they first must be found to be "related activities performed * * * for a common business purpose. * * *" The owner of each of these buildings is not engaged in a business purpose common to all the other eight building owners merely because each employed a common agent. The record is devoid of any other evidence tending to demonstrate that the nine individual building owners have a "common business purpose."[4] Were the buildings managed by their owners, the Government would not attempt to link them together as an enterprise bound together by a "common business purpose." The building owners' employment of the Company as rental agent does not alter this critical fact.

---

4. In Mitchell v. Hertzke, 234 F.2d 183 (10th Cir. 1956), the court held that the Secretary of Labor has the burden of proof on this type of issue in this case.

The legislative intent to exclude for purposes of the Act separate businesses which use common service organizations was made manifest in the Senate Report to the Fair Labor Standards Amendments of 1961, which adopted the "enterprise" concept (1961 U.S.Code Cong. & Admin.News, pp. 1620, 1660–1661):

"The bill also contains provisions which should insure that a small local independent business, not in itself large enough to come within the new coverage, will not become subject to the act by being considered a part of a large enterprise with which it has business dealings.

"The definition of 'enterprise' expressly makes it clear that a local retail or service establishment which is under independent ownership shall not be considered to be so operated and controlled as to be other than a separate enterprise because of a franchise, or group purchasing, or group advertising arrangement with other establishments or because the establishment leases premises from a person who also happens to lease premises to other retail or service establishments. For example, a retail establishment will not become part of an enterprise which operates a shopping center merely because it rents its establishment from the shopping center operator."

If the record in this case revealed that the retention of the Company, as agent, were accompanied by a change in the independent business purposes of the owners—for example facts such as the pooling of profits from the various buildings demonstrating a common business purpose—the result might be different. Here, however, the record reveals that the owners share no common purpose except the decision to hire the Company as their rental or management agent. As pointed out in Wirtz v. Hardin & Co., 253 F.Supp. 579 (N.D.Ala.1964), aff'd 359 F.2d 792 (5th Cir. 1965), the utilization F.2d 792 (5th Cir. 1965), the utilization of a common service does *not* by itself establish a common business purpose shared by the owners of separate businesses. Without more than here presented, we think the "enterprise" requirement of the Act has not been satisfied. It would be anomalous to treat the owners of commercial buildings as proprietors of individual businesses when they manage the buildings themselves and as participating in a "common business purpose" with other building owners merely because they hire a rental agent who manages other buildings.[5] This is particularly so in view of the expressed intent of Congress not to burden small businesses with a minimum wage they may not be able to afford. Therefore, we think the proper approach under the facts of this case is to consider each of the nine buildings separately.

We do not reach additional questions posed on this appeal regarding whether the Company is engaged in interstate commerce as required by the Act, because viewing the gross rentals of each building separately it appears that in 1964 none of the buildings produced sufficient gross rentals to satisfy the Act's economic test. Since the stipulations of fact do not indicate the gross rentals of each building after 1964, we are unable to determine whether any one of the buildings alone satisfies the reduced criteria provided by the 1966 Amendments for coverage under the Act.

Accordingly, the order of the District Court will be reversed and the case remanded so that the Government may have the opportunity to introduce evidence regarding each buildings' gross rentals during the relevant years.

5. It might also be considered anomalous that service employees hired by the management company might be paid different wages depending on the gross rentals of the particular building to which they were assigned. However, in view of the "common business purpose" requirement of the Act, we think the scale tips toward preventing inconsistent treatment of building owners who employ management companies as opposed to owners who manage their own buildings.